United States Court of Appeals,

Eleventh Circuit.

No. 94-4664.

UNITED STATES of America, Plaintiff-Appellee,

v.

Alfredo C. GARCIA, Defendant-Appellant.

April 1, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 89-10017-CR), James Lawrence King, Judge.

Before KRAVITCH, DUBINA and CARNES, Circuit Judges.

CARNES, Circuit Judge:

Alfredo Garcia, appeals his 1993 conviction under the Travel Act, 18 U.S.C. §§ 1952 and 2. Garcia's Travel Act conviction was based on the charge that on or about April 17, 1988, Garcia traveled in foreign commerce with the intent to facilitate the importation of cocaine. Garcia contends that the district court erred in holding that his 1993 conviction under the Travel Act is not barred by the doctrine of collateral estoppel as a result of his 1989 acquittal on a four-count indictment charging him with conspiracy to import cocaine, importation of cocaine, conspiracy to possess cocaine with intent to distribute, and possession of cocaine with intent to distribute. The government concedes that the charges in both prosecutions involve the same alleged importation conspiracy that was in existence from late March 1988 to April 21, 1988. However, the government contends that the Travel Act conviction is not barred by collateral estoppel, arguing that it did not attempt to relitigate any issue in the second trial that was necessarily decided in Garcia's favor in the first trial.

For the reasons discussed below, we disagree and hold that Garcia's conviction is due to be reversed and rendered.

## I. FACTS AND PROCEDURE

Because error can be shown even accepting the government's statement of the facts, we will take that statement as true for purposes of this appeal and quote liberally from it.

A. The Facts Established at the First Trial

On May 31, 1989, the government charged Garcia and seven codefendants with conspiracy to import cocaine, importation of cocaine, conspiracy to possess cocaine with intent to distribute, and possession of cocaine with intent to distribute. The indictment alleged the conspiracy existed "[f]rom in or about late March, 1988 to on or about April 21, 1988." The case proceeded to trial against Garcia and three codefendants.[1]

The government summarizes the evidence against Garcia in the first trial as follows:

> The evidence presented ... showed a scheme involving several co-defendants to import approximately 975 pounds of cocaine with a wholesale value in excess of $6 million from Mexico into the Florida Keys. The co-conspirators used a 50-foot vessel named the *Sea Lark* which was specially fitted with a hidden compartment in a cabinet beneath the steering wheel.
>
> With co-defendant Manuel Fiallo as captain and a crew consisting of co-defendants Ricardo Gaetano and Pedro Martinez, the *Sea Lark* traveled from Key Largo, Florida, to Progresso, Mexico, where it cleared Customs. From there, the *Sea Lark* headed to Carmen Island, off the coast of Mexico, where approximately 400 duffel bags filled with cocaine were loaded. Once the cocaine had been secreted aboard the *Sea Lark,* it headed back to South Florida.
>
> The vessel developed engine problems on the return voyage. Co-defendant Antonio Gonzalez contacted a boat

---

[1]The remaining four codefendants had either pleaded guilty or were fugitives at the time of trial.

mechanic, co-defendant Hector Cabrera, and requested that he perform repairs on the *Sea Lark* at sea. Cabrera agreed; [on or about April 17, 1988,] he left Key Largo aboard a 35-foot sportfisherman and met the *Sea Lark* at the Alacran Reef where he successfully repaired its engines.

Because of his concern that the engines of the *Sea Lark* might develop additional problems, Fiallo requested that Cabrera remain close to the *Sea Lark* for the remainder [of] the trip to Key Largo. During the ensuing journey the Coast Guard stopped and searched both boats; the Coast Guard boarding party did not locate the cocaine that was secreted on the *Sea Lark.*

When the *Sea Lark* developed additional engine troubles and it was determined that Cabrera's sportfisherman was unable to tow it, a third vessel, the *Miss Heineken,* was dispatched from Key Largo to provide assistance. Ultimately, all three boats returned safely to Key Largo. Acting on an anonymous tip, Customs officials conducted an extensive search of the *Sea Lark* which ultimately revealed 450 packages of cocaine weighing about 975 pounds hidden in the secret compartment. The wholesale value of the cocaine was estimated to be in excess of $6 million.

The only evidence of appellant Garcia's participation in that scheme was the testimony of co-defendant Cabrera, who pleaded guilty and testified for the government at trial. [On or about April 17, 1988,] Cabrera traveled in the 50-foot sportfisherman to the Alacran Reef to provide mechanical assistance to the *Sea Lark* and then accompanied that vessel to Key Largo. Cabrera testified that he invited Garcia to accompany him on the trip as his helper because he knew that Garcia "was in sort of a squeeze economically." According to Cabrera's testimony, he did not notice any cargo on the *Sea Lark* when he met it at sea; in fact, Cabrera testified that he did not know what Fiallo and his crew were doing at sea and he learned the purpose of the voyage only after the *Sea Lark* had been seized by the authorities in Key Largo. Upon his return to Key Largo, Cabrera and Garcia went to the home of co-defendant Juan Batista before they went their separate ways; there was no discussion regarding the shipment of cocaine at Batista's house.

Government's brief, pp. 3-5 (record citations omitted).

At the close of all the evidence at the first trial, Garcia moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Garcia argued that the evidence was insufficient to show anything more than his mere presence at the

scene of the crime because even Cabrera, who went aboard the *Sea Lark* to perform repairs, testified that he himself did not know about the cocaine until later and well after the *Sea Lark* had arrived in Key Largo. There was no evidence that Garcia had gone aboard the *Sea Lark* at any time, no evidence that he knew there was cocaine aboard the *Sea Lark,* and no evidence he knew anything about the conspiracy. The district court granted Garcia's motion for judgment of acquittal, as to all four counts, explaining that "there has to be some showing that Alfredo Garcia knowingly joined in [the] conspiracy or knowingly intended to break the law," and there had been none.

B. The Facts Established at the Second Trial

Nearly four years after Garcia had been acquitted in the first trial of all four counts, including conspiracy to import cocaine between March 1988 and April 21, 1988, the government charged Garcia with a Travel Act violation arising out of the same scheme to import cocaine that was the subject of the first prosecution. Specifically, the 1993 indictment charged that, "[o]n or about April 17, 1988, ... Garcia did travel in foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is the importation of a controlled substances, and thereafter did knowingly and willfully perform and cause to be performed, acts to facilitate the promotion, management, establishment and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952 and 2." Garcia filed a pretrial motion to dismiss the indictment on double

jeopardy and collateral estoppel grounds, which the district court denied. Following a three-day trial, the jury returned a verdict finding Garcia guilty as charged. The district court denied Garcia's Rule 29 post-trial motions for judgment of acquittal and for a new trial.

Unlike the first trial at which there was no evidence of Garcia's involvement in the conspiracy, at the second trial there was substantial evidence he was actively involved in it. The government summarizes the second trial evidence against Garcia as follows:

> The evidence showed that one Oscar Caicedo arranged with Garcia's codefendant Harold Bustamonte to import approximately 350 kilograms of cocaine from Colombia into the United States via Mexico. Caicedo hired appellant Garcia to transport the cocaine from Mexico to South Florida based upon Garcia's reputation as one who was experienced in transporting cocaine and his representations to that effect. Before hiring Garcia, Caicedo and his employee Carlos Umberto Rodriguez met with Garcia several times to ensure that Garcia was capable of transporting the cocaine; Garcia met with them in Key Largo and showed them two boats that he could use to transport the cocaine—the *Miss Heineken,* which belonged to Juan Batista, and the *Sea Lark,* which belonged to Antonio Gonzalez. Ultimately, Garcia hired Antonio Gonzalez who provided the *Sea Lark* to import the cocaine as well as a house in Key Largo where the cocaine could be offloaded.

> Garcia was to be paid $50,000 for arranging the transportation of the cocaine; it was Garcia's responsibility to hire a crew for the boat, to pay the crew, and to ensure safe arrival of the cocaine in South Florida. He dispatched the *Sea Lark* to Mexico once he was notified that the cocaine had arrived there. After the *Sea Lark* embarked, Garcia visited Caicedo frequently at his place of business to keep him apprised of the vessel's progress. The vessel was damaged *en route* to Mexico and Garcia was dispatched with the necessary parts to repair the ship. After the cocaine was loaded and the vessel began its return voyage, it experienced engine problems again. [On or about April 17, 1988,] Garcia and Cabrera went to the *Sea Lark* 's assistance in the sportfisherman. While the *Sea Lark* and the sportfisherman were traveling together, the Coast Guard stopped and boarded both vessels; the officer did not find the hidden cargo of cocaine aboard the *Sea Lark.*

Ultimately, the *Sea Lark* with its cargo of cocaine arrived in Key Largo. The crew did not immediately offload the cocaine when the Sea Lark arrived at Antonio Gonzalez' residence in Key Largo, apparently because they suspected that they were under Coast Guard surveillance. Their suspicions were well founded. When the agents failed to discover the cocaine during their initial search of the vessel at Antonio Gonzalez' residence, Garcia suggested to his co-conspirators that, if the vessel were taken to the Custom's dock, they should attempt to steal the cocaine during the night. The agents discovered the cocaine and removed it before the co-conspirators were able to carry out such a plan, however.

Government's brief, pp. 6-8 (record citations omitted). After the jury at the second trial heard this evidence against Garcia, it convicted him of the Travel Act offense.

## II. DISCUSSION

Although Garcia attacks his conviction on several grounds, we address only the collateral estoppel issue because our disposition of that issue moots the others. "The doctrine of collateral estoppel is a narrow exception to the Government's right to prosecute a defendant in separate trials for related conduct." *United States v. Brown,* 983 F.2d 201, 202 (11th Cir.1993); *United States v. Lee,* 622 F.2d 787, 789 (5th Cir.1980) ("The protection of collateral estoppel is an established rule of federal criminal law and extends to prevent redetermination of evidentiary facts as well as ultimate facts."), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981). Collateral estoppel bars a subsequent prosecution when a fact or issue necessarily determined in the defendant's favor in the first trial is an essential element of the conviction at the second trial. *Brown,* 983 F.2d at 202; *United States v. Bennett,* 836 F.2d 1314, 1316 (11th Cir.), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988).

In *Brown* we said that applying the doctrine of collateral

estoppel is a two-step process. 983 F.2d at 202. First, the Court must decide whether it can ascertain the basis of the acquittal at the first trial. *Id.; see also Lee,* 622 F.2d at 790 ("When collateral estoppel is raised by a defendant, the court's task is to decipher exactly what facts have been or should be deemed to have been determined at the first trial."). The second step is to determine whether the element or elements of the crime upon which the prior acquittal were based are also essential elements of the crime for which the defendant was convicted at the second trial. *Brown,* 983 F.2d at 202. The burden of persuasion is on the defendant as to both steps of the test. *Id.* As we said in *Brown,* "the identity of overlapping elements required for collateral estoppel must extend beyond the legal definition of the elements." *Id.* at 204. There also has to be such factual identity of the issues that, "[t]he subsequent verdict of conviction [is] rationally inconsistent with the prior verdict of acquittal." *Id.* Garcia contends that he has carried his burden as to both prongs of the collateral estoppel inquiry. We agree.

The first step of the collateral estoppel analysis is simple to perform in this case, because the acquittal at the first trial was the result of a Rule 29 motion, and the district court stated its reasons for granting the motion on the record. After Garcia made the Rule 29 motion in the first trial, the district court asked the prosecutor if there was any evidence that Garcia knew, or should have known, when he went with Cabrera to the aid of the *Sea Lark* on April 17, 1988, that he was helping to rescue a boat carrying cocaine. The prosecutor conceded that no such evidence

had been presented.  The court then granted the motion for judgment of acquittal, explaining:

> Well, it would seem to me that that problem is not sufficient to offset the mere presence at the scene of a crime and even some general knowledge that a crime may be committed, may be in the process of being committed at that time, there has to be some showing that Alfredo Garcia knowingly joined in [the] conspiracy or knowingly intended to break the law.

Thus the basis of Garcia's acquittal at the first trial was the district court's finding that the government had failed to prove that Garcia was knowingly involved in the cocaine conspiracy. The government had based its case against Garcia on his accompanying Cabrera to repair the *Sea Lark* on April 17, 1988, but the government failed to prove that Garcia knowingly joined the conspiracy or intended to break the law at that time or at any time during the conspiracy charged in the indictment, which extended "[f]rom in or about late March, 1988 to on or about April 21, 1988." For collateral estoppel purposes, the district court's judgment of acquittal established for all time Garcia's lack of knowing involvement in the cocaine conspiracy, and his lack of intent to break the law in connection with that conspiracy, not only on April 17, but at all times between "late March, 1988" and "about April 21, 1988." In other words, the district court's order granting the Rule 29 motion in the first trial established that Garcia was not knowingly involved in the charged conspiracy at any time during the specified period, because proof of his knowing involvement at any time during that period would have been sufficient for conviction. As to the second step of the collateral estoppel test, the question is whether the finding established by the acquittal at the first trial is inconsistent with an essential

element of Garcia's Travel Act conviction. If so, collateral estoppel bars the second prosecution and Garcia's Travel Act conviction must be reversed. *Bennett*, 836 F.2d at 1316 ("To bar prosecution, a finding of fact must be inconsistent with a finding of guilt in a second trial."); *United States v. Mock,* 604 F.2d 341, 343 (5th Cir.1979) (stating that collateral estoppel bars "the reintroduction or relitigation of *facts* already established against the government"). This step begins with the elements the government was required to prove to obtain a Travel Act conviction.

"A conviction under the Travel Act requires the jury to find that the defendant traveled in interstate [or foreign] commerce with the intent to promote unlawful activity," and "must be based on proof of guilty knowledge during specific travels." *United States v. Kramer,* 73 F.3d 1067, 1071 (11th Cir.1996). Garcia was indicted for Travel Act violations arising on or about April 17, 1988. The government's initial theory in the second prosecution was that Garcia had traveled with Cabrera out into international waters on or about April 17, 1988, to repair the *Sea Lark* with the intent and for the purpose of allowing the *Sea Lark* to continue its mission of importing cocaine it had picked up in Mexico into this country. The government used the April 17 date in the indictment. However, after Garcia pressed the issue of collateral estoppel, the government adjusted its strategy and sought to base the Travel Act offense on an earlier trip Garcia and Cabrera had made to repair the *Sea Lark* when it was *en route* to Mexico, before it had picked-up the cocaine. Garcia made that trip just a few days before April 17. The government was collaterally estopped by the

result of the first trial from proving at the second trial that Garcia made either trip with knowledge of and intent to promote the conspiracy and its unlawful activity. That is so because both trips fall within the time period of the conspiracy charged in the first trial, and the Rule 29 acquittal at the first trial establishes that Garcia did not participate in or know about the conspiracy during that time.

The government argues that the fact found against it in the first trial was only that Garcia lacked knowledge that there was cocaine aboard the *Sea Lark* at the time he and Cabrera travelled to repair it on April 17, and that that finding did not estop the government from proving at the second trial that Garcia had joined the conspiracy and had guilty knowledge when he travelled to repair the *Sea Lark* a few days before April 17, when it was on its way to Mexico to pick-up the cocaine. We disagree. The district court's judgment of acquittal necessarily established more than the narrow proposition that Garcia did not know the cocaine was aboard the *Sea Lark* on April 17. It established more than that, because if Garcia had already joined the conspiracy on or before April 17, 1988, he could have been convicted of the conspiracy at the first trial even if he did not know the cocaine was onboard on that date. *See, e.g., Lee,* 622 F.2d at 790 ("[C]onviction of drug conspiracy does not require proof of possession or any other overt act." (citing *United States v. Thomas,* 567 F.2d 638, 641 (5th Cir.1978)). Even if Garcia did not know the *Sea Lark* was carrying cocaine at the time that he went out to repair it on April 17, 1988, if he had believed at that time that the *Sea Lark* later would be loaded with

cocaine, he would have known that repairing it would facilitate the cocaine conspiracy. That would have been enough to convict him of the conspiracy at the first trial.

To accept the government's attempted reconciliation of the results of the two trials, we would have to believe it logical for Garcia to have travelled with the intent to promote the conspiracy, and then a few days later to have had no knowledge of that same conspiracy. Because these two propositions are logically inconsistent, the acquittal at the first trial cannot be reconciled with the conviction at the second trial. Accordingly, the second result—the conviction—is barred by collateral estoppel.

### III. CONCLUSION

Garcia's conviction is REVERSED, and this case is REMANDED with instructions that the indictment be dismissed.