[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-10694

_____

D. C. Docket No. 99-00583-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SALVADOR MAGLUTA,
a.k.a. Sal,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 27, 2005)**

Before CARNES and COX, Circuit Judges, and MILLS[*], District Judge.

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

CARNES, Circuit Judge:

In August of 2002, a jury convicted Salvador Magluta of twelve counts: eight counts of laundering drug proceeds, and one count each of conspiracy to launder drug proceeds, conspiracy to obstruct justice, obstruction of justice by bribing a witness, and obstruction of justice by bribing a juror. The jury also returned a special forfeiture verdict requiring Magluta to forfeit $15 million in currency, and also some real property.

In January of 2003, the district court sentenced Magluta to 2,460 months (205 years) in prison. The total sentence was rang up this way: 240 months on each of the eight substantive drug proceeds laundering counts; 240 months on the conspiracy to launder count; 60 months on the conspiracy to obstruct justice count; 120 months on the obstruction by bribing a juror count; and 120 months on the obstruction by bribing a witness count. Each sentence was made consecutive to every other one.

Magluta asserts that his convictions on a number of the counts must be reversed and also that his sentence was incorrectly calculated. First, he contends that his convictions on all nine of the money laundering counts (eight substantive and one conspiracy) must be reversed on collateral estoppel grounds. The basis for this contention is that six years before this trial he was acquitted of substantive

2

drug offenses, and evidence of those offenses was used to prove the money laundering charges in this trial. Second, Magluta contends that the evidence was insufficient to support his convictions on the eight substantive money laundering counts.

Magluta's third and fourth contentions attack his conviction on the obstruction of justice through juror bribery count. He argues that it must be reversed because the district court erred in admitting certain out-of-court statements of a bribed juror under the co-conspirator exception to the hearsay rule contained in Fed. R. Evid. 801(d)(2)(E). He also argues that this conviction must be reversed because the district court did not give a special unanimity instruction geared to the identity of the juror who was allegedly bribed.

Fifth, Magluta contends that documentary evidence vital to several of his convictions was seized and admitted at trial in violation of his Fourth Amendment rights thereby tainting some of his convictions. If we agree, he asks that we remand to the district court with instructions for it to determine which of his convictions were tainted by this assertedly erroneously introduced evidence. Finally, Magluta makes several arguments that his sentence was incorrectly calculated. We will address each of these six major contentions in the order we have listed them.

3

# I.

Magluta's attack on his money laundering convictions in this case centers around his 1996 acquittal on all of the twenty-four drug-related counts against him. In that earlier case the district court granted judgments of acquittal on seven counts, and the jury acquitted Magluta of all of the remaining ones. Among the charges for which Magluta was acquitted in the earlier trial were: operating a continuing criminal enterprise from January 1978 through April 1991; conspiring to import and distribute cocaine during that same period of time; and engaging in a number of substantive drug importation and distribution offenses from 1986 through 1989. The continuing criminal enterprise count in that earlier case incorporated all of the conspiracy and substantive drug offenses that were separately charged in that case.

Magluta contends that the 1996 acquittal established that he was not involved in drug offenses during the periods of time charged in that case, which include the times when the crimes charged in this case took place. His position is that the government was collaterally estopped from introducing in this case evidence of drug offenses allegedly committed during the periods of time covered by the charges in the first case. The district court disagreed, and so do we.

The government did introduce in this case evidence of criminal activity for

which Magluta had been acquitted in the earlier case. The money laundering conspiracy charged in this case involved criminal activity beginning in January 1979 and extending through December 2001, and the substantive money laundering charges involved criminal activity that occurred in October and December 1998. In proving those charges in this case, the government introduced evidence of illegal drug activities that had taken place between 1978 and 1991,which is the period of time alleged in indictment in the earlier case where Magluta was acquitted.[1] The government used evidence of that criminal activity in order to establish in this case the "specified unlawful activity" element, 18 U.S.C. § 1956(a)(1)(B)(i), of the money laundering charges against Magluta.[2]

"The doctrine of collateral estoppel is a narrow exception to the Government's right to prosecute a defendant in separate trials for related conduct."

---

[1] As we say in the text, Magluta was acquitted in the 1996 trial of charges that he had committed drug offenses beginning in 1978. He said during that trial he had ceased all illegal drug activities in 1980. As a consequence of his having acknowledged that he had engaged in drug activities until some time in 1980, Magluta has narrowed the issue he is raising in this case to whether the government was collaterally estopped from attempting to prove that he engaged in illegal drug activities between 1980 and 1991.

[2] To prove that Magluta engaged in money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government had to establish that: (1) Magluta conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) Magluta knew the proceeds were from some form of illegal activity; and (4) Magluta knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds. See United States v. Majors, 196 F.3d 1206, 1212 (11th Cir. 1999). Felony drug offenses qualify as a "specified unlawful activity" as that term is used in § 1956. See 18 U.S.C. §§ 1956(c)(7)(B)(i) & (A), 1961(1).

United States v. Brown, 983 F.2d 201, 202 (11th Cir. 1993); see also United States v. Garcia, 78 F.3d 1517, 1521 (11th Cir. 1996).  Collateral estoppel "bars a subsequent prosecution only where a fact or issue necessarily determined in the defendant's favor in the former trial is an essential element of conviction at the second trial."  Brown, 983 F.2d at 202; see also Garcia, 78 F.3d at 1521.

> Applying the collateral estoppel doctrine requires a two-step analysis:
>
> First, a court must decide whether it can ascertain the basis of the acquittal at the first trial.  More precisely, a court must determine whether the jury's verdict of acquittal was based upon reasonable doubt about a single element of the crime which the court can identify. [Second], the court must then decide whether that element is also an essential element of the crime for which the defendant was convicted in the second trial.

Brown, 983 F.2d at 202.  "'[T]he identity of overlapping elements required for collateral estoppel must extend beyond the legal definition of the elements.'  There also has to be such factual identity of the issues that '[t]he subsequent verdict of conviction [is] rationally inconsistent with the prior verdict of acquittal.'"  Garcia, 78 F.3d at 1521 (quoting Brown, 983 F.2d at 202).  The burden of persuasion is on the defendant as to both steps of the analysis.  Id.; Brown, 983 F.2d at 202.

As for the first step, Magluta argues that the basis of his 1996 acquittal was that he had ceased all drug trafficking activities in May 1980.  This has to have been the basis for his acquittal, Magluta says, because it was the only defense he put forward to the crimes alleged in his 1996 trial.  We can assume without

6

deciding that Magluta is right about this point, and thereby satisfies the first step of the collateral estoppel test, because he does not satisfy the second one.

The second step of the collateral estoppel test requires Magluta to establish that the elements of the crime on which the prior acquittal was based are also essential elements of the crime for which he was convicted at the second trial. See Garcia, 78 F.3d at 1521; Brown, 983 F.2d at 202. That is to say, Magluta must show that the elements of the drug offenses which led to his acquittal in the 1996 trial are essential elements of the money laundering offenses for which he was convicted in this case.

Even if we accept for present purposes Magluta's premise that his 1996 acquittal established he was not involved in the illegal drug activity with which he had been charged in that earlier case, his argument still fails. It fails because Magluta's personal involvement in, or guilt of, the criminal activity charged in the earlier case is not an element of the money laundering charge he was convicted of in this case. This indictment charged Magluta with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), with the specified unlawful activity being felony drug offenses. The government had to prove that Magluta, with the requisite knowledge and intent, conducted a financial transaction involving the proceeds of felony drug offenses. See Majors, 196 F.3d at 1212. The government did not have

7

to prove, however, that Magluta committed the felony drug offenses. See id. As far as the money laundering statute is concerned, laundering someone else's illegal proceeds is just as bad as laundering your own—there is no help-thy-neighbor exception to § 1956(a)(1)(B)(i). Accordingly, the collateral estoppel effect of Magluta's 1996 acquittal of illegal drug activity does not extend to any of the essential elements of the money laundering charges on which he was convicted in this case.

## II.

Magluta challenges the sufficiency of the evidence to support his convictions on the eight substantive money laundering counts. While phrased in sufficiency of the evidence terms, Magluta's actual challenge here raises the issue of whether the relevant facts, which are essentially undisputed, constitute money laundering. As we have mentioned, Magluta was convicted of money laundering conducted for the purpose of concealing the nature, location, source, ownership, or control of the illegal drug proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The charges and evidence centered on the fact that Magluta had paid his lawyers with checks written from an Israeli bank account held under a fictitious name.

On September 10, 1998, Richard Passapera, a Magluta associate, delivered $1.2 million in illegal drug proceeds to Antonio Garcia, another Magluta associate,

8

in Miami. Unbeknownst to Passapera and Magluta, however, Garcia had become an FBI informant. Garcia turned the money over to the FBI, which transported it to New York where it gave the money back to Garcia in order to complete the transaction. In New York, Garcia gave the money to Harry Kozlik and Isaac Benatar, who were also Magluta associates. Kozlik transported the money to Israel and deposited it in an Israeli bank under the fictitious name of "Leonard Friedman." Kozlik eventually provided Garcia with eight blank checks issued from the account. Garcia, at the direction of the FBI, passed the checks on to Passapera. Magluta then used the checks to pay his lawyers.

Magluta makes three arguments to support his position that the established facts about what happened to the drug proceeds are not sufficient to make out money laundering. His first argument is that, because the proceeds had been under the control of law enforcement before he used them to pay his lawyers, the money had lost its "tainted" character and was no longer proceeds of a specified illegal activity in the sense required by § 1956(a)(1)(B)(i). Unable to find a money laundering decision of any court on point with his position, Magluta asks us to draw an analogy to stolen property cases, where property loses its "stolen" character once it is recovered and controlled by law enforcement. See, e.g., United States v. Cohen, 274 F. 596, 599 (3d Cir. 1921). We are not persuaded to do that.

9

The plain language of the money laundering statute requires that the "financial transaction . . . in fact involves the proceeds of [a] specified unlawful activity." 18 U.S.C. § 1956(a)(1). But there is nothing in the statutory language to suggest that, in addition to being from a specified unlawful activity, the proceeds must never have been in the control of the government before they reached the defendant. It seems to us that laundered money does not become any less laundered because the government helped the process along or chose not to stop it. Having said that, we are not asked to decide whether government intrusion into laundering transactions ever could rise to the level that the money no longer qualifies as the "proceeds of [a] specified unlawful activity" under § 1956(a)(1). All we must decide here is whether the level of government involvement in this case was enough to change the nature of the proceeds. On the facts of this case, it was not.

Magluta's second argument is that allowing actual drug proceeds which have been in the possession of the government to form the basis for a conviction under § 1956(a)(1) would make the money laundering "sting" statute, 18 U.S.C. § 1956(a)(3), superfluous.[3] Sections 1956(a)(1) and 1956(a)(3) cover different

---

[3] 18 U.S.C. § 1956(a)(1) states:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a

situations.  The (a)(1) subdivision covers situations where the proceeds are actually

from a specified unlawful activity.  18 U.S.C. § 1956(a)(1).  The (a)(3) subdivision

covers situations where the government, or some person at the direction of the

government, represents that the proceeds are from a specified unlawful activity

though in reality they are not.  Id. § 1956(a)(3).  The two provisions serve different

purposes.  Neither provision is rendered superfluous by our holding that the level

of government involvement in the laundering in this case was not enough to

---

financial transaction which <u>in fact</u> involves the proceeds of specified unlawful activity—
. . . .
    (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
        . . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Id. (emphasis added).

18 U.S.C. § 1956(a)(3) states:

Whoever, with the intent—
    . . . .
    (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
    . . . .
conducts or attempts to conduct a financial transaction involving property <u>represented to be</u> the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

Id. (emphasis added).

11

cleanse these "proceeds of specified unlawful activity" of their taint for

§ 1956(a)(1)(B)(i) purposes.

Magluta's third argument on this issue is that by the time he wrote the checks to his lawyers the money had already been laundered; therefore, he says, his acts amounted to mere spending for his personal benefit, not laundering in violation of § 1956(a)(1)(B)(i). We have stated that payments for personal benefit out of previously laundered proceeds do not themselves constitute money laundering unless they are designed to conceal the nature or source of the money. See Majors, 196 F.3d at 1213 (internal quotation and marks omitted).

We have set out several factors that are helpful in determining whether a transaction was designed to conceal as required by § 1956(a)(1)(B)(i). "Evidence that may be considered when determining whether a transaction was designed to conceal includes, among others, statements by a defendant probative [o]f intent to conceal; unusual secrecy surround[ing] the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals." Id. at 1213 n.18 (emphasis omitted).

12

Magluta paid his lawyers with checks written on an Israeli bank account held in a fictitious name. The several transfers of cash between Magluta associates, the movement of the cash from Miami to New York to Israel, and the use of a foreign account held in a false name are "a series of unusual financial moves" which culminated in Magluta writing the checks. See id. There thus was an air of "unusual secrecy surround[ing] the transaction[s]." See id. Magluta's use of his associates, as well as the fictitious "Leonard Friedman," demonstrate his use of "third parties to conceal the real owner" of the money in the foreign account. See id. The final transaction itself—Magluta writing checks on a foreign account held in a false name—is "highly irregular." See id.

In sum, Magluta went to great pains to conceal the fact that he was using drug proceeds to pay his lawyers. His doing so meets the definition of money laundering for purposes of § 1956(a)(1)(B)(i), even if the final transfer of the laundered proceeds was also for Magluta's personal benefit. See Majors, 196 F.3d at 1213 & n.18; cf. United States v. Abbell, 271 F.3d 1286, 1298 (11th Cir. 2001) ("We believe it is enough for [§ 1956(a)(1)(B)(i)] that [the] Defendants engaged in transactions from which Rodriguez-Orejuela received a benefit (and moneys were paid on behalf of Rodriguez-Orejuela) while concealing that Rodriguez-Orejuela was the source of the funds."). Magluta's convictions on the substantive money

laundering counts stand.

## III.

Magluta's third major contention is that his conviction for obstruction of justice through juror bribery must be reversed because the district court erred in admitting two out-of-court statements made by Miguel Moya, who had been the jury foreman in the 1996 trial. The government used those statements to prove that Magluta had bribed Moya to produce an acquittal in that earlier case.

The first of the two statements in question was made by Moya to undercover FBI Agent Joaquin Garcia in a recorded conversation that took place in July 1998. In that conversation Garcia told Moya that he had been sent by Magluta (and Magluta's co-defendant in the 1996 trial, Augusto Falcon) to ensure that Moya kept quiet about the bribe he had received two-and-a-half years earlier. After prodding by Garcia, Moya acknowledged having accepted that bribe from Magluta and his co-defendant Falcon.[4] Moya assured Garcia that only his wife and parents knew he had received the bribe money, and he promised Garcia that he would not cooperate with authorities.

The court admitted Moya's statements as non-hearsay statements of a co-

---

[4] We have no way of knowing exactly how large the bribe was that Moya received. The record does show, however, that although Moya and his family were of modest means, they made $330,000 in cash expenditures and bank deposits in the twenty-seven months following the trial.

14

conspirator under Fed. R. Evid. 801(d)(2)(E). "We review the district court's evidentiary rulings for an abuse of discretion," United States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003), and we may overturn findings of fact only if clearly erroneous, United States v. Griggs, 735 F.2d 1318, 1325 (11th Cir. 1984).

"Under Rule 801(d)(2)(E), statements of co-conspirators made during the course and in furtherance of the conspiracy are not hearsay. For evidence to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence these things: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy. In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence." Hasner, 340 F.3d at 1274. In ruling on the admissibility of the conversation between Moya and Agent Garcia under Rule 801(d)(2)(E), the district court found that:

> [T]his conspiracy continued to exist up through July of 1998, when this statement was made. The Court does find that although Mr. Moya's participation was in just one component, he was a participant in the overall scheme. He would not have known all of the ins and outs of the conspiracy that's charged in this Indictment, but . . . in agreeing to . . . accept[] the bribe for convincing the other jurors to return a judgment of acquittal, he is still a member of the conspiracy.

15

He sat and listened to the evidence in the case . . . that Mr. Falcon and Mr. Magluta were participants in a major drug trafficking organization; that the monies that were connected with them were proceeds of a major drug trafficking organization . . . . I find that the government has proved by a preponderance of the evidence that . . . [Moya] knew that the [bribe] money was from a specified unlawful activity and, therefore, he took actions to cover up his sudden found wealth in creating all of the various gifts of funds to his relatives and near relatives and friends . . . . So his participation and his actions continue to evidence efforts to cover up his criminal acts. The law does find that such conduct of covering up the acts are part and parcel of the conspiracy.

Magluta argues that if he and Moya conspired to obstruct justice through juror bribery, the central purpose of that conspiracy ended, at the latest, once the verdict in the earlier case was rendered in February 1996. As a result, according to Magluta, Moya's conversation with the undercover FBI agent, which took place in July 1998, was not made during the course of the juror bribery conspiracy but instead came well after the conspiracy had ended.

In Grunewald v. United States, 353 U.S. 391, 77 S. Ct. 963 (1957), the Supreme Court held that: "[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." 353 U.S. at 401–02, 77 S. Ct. at 972. The Court also recognized that "a vital distinction must be made between acts of concealment done in

16

furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Id. at 405, 77 S. Ct. at 974.

The central purpose of the juror bribery conspiracy between Magluta and Moya was to secure an acquittal for Magluta in return for cash. Once the verdict was rendered, that central purpose was completed. Although it was mutually understood that Magluta and Moya would conceal the bribe, in the Supreme Court's words, those "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." Id. at 402, 77 S. Ct. at 972. In light of Grunewald, we cannot infer that a subsidiary conspiracy to conceal the bribe Magluta had given Moya existed for almost two-and-a-half-years after the bribery agreement had been made and carried out. See id. at 401–02, 77 S. Ct. at 972. As a result, Moya's statement to Agent Garcia was not in furtherance of the conspiracy to obstruct justice through juror bribery.

The government argues, and the district court's findings indicate it believed, that Moya's statements are admissible under Rule 801(d)(2)(E) on the ground that it was in furtherance of another conspiracy. Under this theory, there was a

conspiracy between Magluta and Moya to launder drug proceeds in violation of § 1956(a)(1)(B)(i). That conspiracy would have begun when Moya accepted the bribe from Magluta, which was paid out of illegal drug proceeds, and it was still ongoing at the time Moya assured Agent Garcia that he would keep quiet about it.[5]

We will assume for the moment that Moya's acceptance of the bribe made him and Magluta participants in a conspiracy to launder drug proceeds under 18 U.S.C. § 1956(a)(1)(B)(i). Cf. Abbell, 271 F.3d at 1298 (affirming the defendant lawyers' convictions for violating § 1956(a)(1)(B)(i) where the lawyers gave money to certain inmates while concealing that the money was being paid at the direction of and on behalf of the lawyers' client). Even with that assumption the argument fails under Grunewald, because Moya's statements to Agent Garcia were not made during the course of and in furtherance of that money laundering conspiracy.

As we mentioned before, Moya's statements to Agent Garcia occurred two-and-a-half years after Moya accepted the bribe. Assuming Magluta's payment of the bribe to Moya constituted a conspiracy between them to launder drug proceeds

---

[5] That this conspiracy was not charged in the indictment in this case does not matter. United States v. Salisbury, 662 F.2d 738, 740 (11th Cir. 1981) ("Statements of a coconspirator may be introduced into evidence even though the government has not charged [the coconspirator] with conspiracy as long as the existence of the conspiracy has been properly established.").

18

in the amount of the bribe, the evidence does not support an inference that the initial conspiracy included a "subsidiary conspiracy to conceal" which was ongoing so long after the bribe—the single act of money laundering—had occurred. See Grunewald, 353 U.S. at 401–02, 77 S. Ct. at 972.

Moya's statements to Agent Garcia do constitute an attempt to keep any initial conspiracy secret, but that attempt is not enough by itself to establish the coverup two-and-a-half years later was part of the initial agreement between Magluta and Moya. As the Supreme Court explained: "[E]very conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." Id. at 402, 77 S. Ct. at 972.

That Moya tried to hide the source of the funds he used to make purchases for himself and his family does not bring those acts into any earlier drug laundering conspiracy between Magluta and Moya. Whatever crimes Moya may have committed by concealing the source of the funds that he used to pay for his

19

purchases, there is no evidence to suggest that making them was part of the initial conspiracy between him and Magluta. Otherwise, the government could have charged Magluta with money laundering for every purchase Moya made with the bribe proceeds; that would not be a reasonable interpretation of the conspiracy and money laundering laws. Because the later transactions that Moya engaged in were not part of the "initial agreement" between him and Magluta, see Grunewald, 353 U.S. at 402, 77 S. Ct. at 972, they do not extend the life of the money laundering conspiracy that began in January of 1996 to include Moya's July 1998 statements to Agent Garcia. As a result, the district court should not have admitted Moya's statements to Agent Garcia pursuant to Rule 801(d)(2)(E).

The government argues that, even if the district court erred by admitting Moya's statements to Agent Garcia, the error was harmless because it presented other evidence to support the obstruction of justice through juror bribery conviction. As we have previously made clear, a "non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, 'or had but very slight effect.'" United States v. Hornaday, 392 F.3d 1306, 1315 (11th Cir. 2004) (citations omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 762, 764, 66 S. Ct. 1239, 1246, 1248 (1946)). Furthermore, "[i]f one can say 'with fair assurance . . . that the judgment

20

was not substantially swayed by the error,' the judgment is due to be affirmed even though there was error." Id. at 1315–16 (quoting Kotteakos, 328 U.S. at 764, 66 S. Ct. at 1248). The government has not met this standard.

Moya's statements to Agent Garcia constituted the evidence directly tying Magluta to the bribe. Even if we were to consider Moya's statement to his then-wife (the other statement that Magluta asserts was erroneously introduced), we are left only with the conclusion that Moya was bribed, not that it was Magluta who paid the bribe.[6] Although common sense would suggest that Magluta was involved, Magluta was being tried with a co-defendant who had as much reason to bribe jurors as Magluta did. With no other direct evidence linking Magluta to the bribe, we "cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error." See Kotteakos, 328 U.S. at 765, 66 S. Ct. at 1248. The error, therefore, was not harmless. For these reasons, Magluta's conviction for obstruction of justice through juror bribery is due to be reversed.[7]

---

[6] Moya's ex-wife testified that on January 31, 1996 (which was during Magluta's previous trial) at approximately six o'clock in the evening Moya received a telephone call at home from a man named Eddy. In response to the call Moya left the house, and two to three hours later came back carrying a brown paper bag. Ms. Moya asked him what was in it. He showed her the contents of the bag: bundles of cash. She testified that when she asked Moya what the money was for, "[h]e said it was given to him in order to persuade the jury in the trial that he was on." According to Ms. Moya, when she asked her husband why he had taken the bribe, Moya told her that "[h]e had to do it," and "he couldn't get out of what he was doing." She did not testify that Magluta was mentioned.

[7] In light of this conclusion, we have no reason to address the issue Magluta has raised involving the admission of the statements Moya made to his wife at the time.

21

## IV.

Magluta's fourth contention is that his conviction on the obstruction of justice through juror bribery count must be reversed for an additional reason. He argues that the district court erred when it failed to instruct the jurors in this case not to convict on this count unless they unanimously agreed on which juror or jurors Magluta had bribed in the earlier case. Because we have already decided to reverse the conviction on this count for other reasons, we need not address this contention any further.

## V.

Magluta's fifth contention is that the district court erred by denying his motion to suppress certain documents seized on October 15, 1996. Those documents were found inside a box that was seized without a warrant from the trunk of a car driven by Marilyn Bonachea, an associate of Magluta. Magluta argues that the officers lacked probable cause to search the box of documents and, as a result, his Fourth Amendment rights were violated.

On October 15, 1996, which was after Magluta was acquitted in the first trial, Guy Lewis, then an Assistant United States Attorney in Miami, received an anonymous telephone call. The caller advised Lewis that later that morning Bonachea would be transporting certain documents from her home to the office of

22

Magluta's lawyer. Lewis knew Bonachea was a close associate of Magluta. The caller said that the documents Bonachea would be transporting contained information relating to the ongoing Magluta investigation, including information about how drug money had been used to bribe individuals to give false testimony in the earlier trial. The caller said that Bonachea would be leaving her home in south Dade County at a specified time and gave the address. The caller also told Lewis that Bonachea would be driving a rental car, which the caller described, and that Bonachea commonly smoked marijuana when driving.

This was the second call AUSA Lewis had received from this anonymous caller. The previous call had provided Lewis with an address for Bonachea's son at Bonachea's home, the same address from which the caller said that Bonachea would be leaving later that day.

Immediately after receiving the second call, AUSA Lewis contacted Special Agent Jane Anglestead of the Drug Enforcement Agency and Sergeant Robert Fielder of the Miami Police Department, both of whom were investigating Magluta and knew of his intimate relationship with Bonachea. Anglestead had been involved in prosecutions of Magluta since 1991. She knew from Bonachea's testimony in those cases that she had been associated with Magluta for a long time. Anglestead was also aware that at some time in the 1980s Bonachea had received

23

approximately $585,000 from Magluta for the purchase of a house in South Florida, a house that was located adjacent to Magluta's property. Anglestead knew that two of the checks used for the house had come from a Bahamian account that Magluta maintained under another name. Furthermore, Anglestead was aware that Bonachea had frequently visited Magluta while he was incarcerated in a federal detention center awaiting trial. Based on this knowledge, Anglestead surmised that Bonachea might very well have the kind of documents described by the anonymous caller.

Shortly after being told by AUSA Lewis of the anonymous call earlier in the day, Agent Anglestead went to Bonachea's residence. The residence was at the address the caller had said it was. There Anglestead saw a rental vehicle matching the caller's description, and watched Bonachea leave the house within twenty minutes of the time that the caller had predicted. Florida Highway Patrol officers, who had been contacted by Sergeant Fielder, followed Bonachea.

After determining that Bonachea was speeding, the officers pulled her over. They confirmed with her that the car was a rental. One trooper noticed what appeared to be marijuana seeds in the ashtray. As a result, he called in a drug dog who, after examining the car, alerted to the console area where two marijuana cigarettes were then found. Bonachea was arrested and the trooper inventoried the

vehicle, noting the parcels of paperwork in the trunk. Sergeant Fielder then arrived at the scene and informed Bonachea that he was going to inspect the vehicle. Bonachea objected, claiming that there were documents in the trunk stamped "attorney-client privilege." Fielder proceeded to open the trunk and found a cardboard box containing, among other things, what he recognized as drug ledgers.

The magistrate judge's report recommended that Magluta lacked standing to object to any alleged violation of the Fourth Amendment and that, in any event, law enforcement had probable cause to search the trunk. The district court, with the exception of two factual details not relevant here, adopted the magistrate judge's factual findings and legal conclusions and denied Magluta's motion to suppress.

Magluta challenges both the district court's decision that he lacked standing and its decision that law enforcement had probable cause to search Bonachea's trunk. "[W]e apply a mixed standard of review to the district court's denial of the suppression motion, reviewing the court's findings of fact for clear error and its application of the law to those facts de novo." United States v. Tinoco, 304 F.3d 1088, 1116 (11th Cir. 2002). Because we find that the district did not err in determining that the law enforcement officers had probable cause to search the contents of Bonachea's car, we will assume, without deciding, that Magluta has

standing to allege a Fourth Amendment violation.

In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause. There are, however, exceptions. Under the automobile exception to the warrant requirement, officers can search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime. California v. Acevedo, 500 U.S. 565, 579–80, 111 S. Ct. 1982, 1991 (1991); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003). Because there is no dispute that the car Bonachea was driving was operational, our inquiry is limited to determining whether the officers had probable cause to believe that the box in her car contained evidence of a crime. See Watts, 329 F.3d at 1286. "Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)).

Under the circumstances of this case, the anonymous tip received earlier in the same day is entitled to substantial weight in the analysis of whether law enforcement had probable cause to believe that the box in Bonachea's trunk

26

contained evidence of criminal activity.  See generally Gates, 462 U.S. at 237–39, 103 S. Ct. at 2332–33 (noting that anonymous tips are considered in the probable cause determination).  In addition to notifying law enforcement that Bonachea's car would be carrying documents evidencing drug activity, the caller provided the correct location of Bonachea's residence, an accurate description of the rental car she would be driving, and predicted that Bonachea would depart within twenty minutes of the time she actually did.  The caller was also correct about Bonachea's smoking marijuana in the car. (A fact discovered after the car was lawfully stopped for speeding.)  All of this information from the caller was corroborated by law enforcement officers before the box in the trunk of Bonachea's car was searched. See id. at 241, 103 S. Ct. at 2334 ("Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work.").

Furthermore, on a previous occasion, this same caller had provided AUSA Lewis with the address where Bonachea's son was staying.  That was the same address that Bonachea left from on October 15, 1996, as the caller had said she would, and at about the time the caller had said.  The law enforcement officers were also aware of Bonachea's intimate relationship with Magluta, that she knew his organization, and that she often visited him in jail.  From these facts, they

27

reasonably inferred that Bonachea was a person likely to be holding for Magluta the kind of documents described by the anonymous caller. All of these pieces of information bolster the caller's credibility.

Based on the totality of the circumstances leading up the search, we conclude that the district court did not err in holding that the law enforcement officers had probable cause to believe that the box located in the trunk of Bonachea's rental car contained evidence of a crime.

## VI.

The remainder of Magluta's contentions attack his 205-year sentence. Because we have already decided that Magluta's conviction for obstruction of justice through juror bribery must be reversed, on remand it will be necessary for the district court to strike the 120-month sentence imposed for that count. Striking that 120-month sentence will leave Magluta with a sentence of 195 years imprisonment.

Magluta contends that this remaining portion of his sentence must be vacated for other reasons. For one thing, he argues that the district court erred in determining that the value of the drug money he had laundered was $35,498,957.80, a determination that affected his total offense level. According to Magluta, the jury's special forfeiture verdict of $15 million should have been a cap

28

on the value of the funds that the district court could find were involved in the money laundering scheme for purposes of calculating his specific offense characteristics pursuant to U.S.S.G. § 2S1.1(b)(2) (2000). If Magluta is correct about this, his total offense level should have been 41 instead of 43. See U.S.S.G. § 2S1.1(b) (2000).

Magluta casts this argument in collateral estoppel terms, saying that "[t]he district court violated principles of collateral estoppel by refusing to accept the jury's special forfeiture verdict of $15 million as a cap on the 'value of the funds' laundered." Appellant's Initial Br. at 51. The court was collaterally estopped, according to Magluta, because the jury's forfeiture inquiry matches exactly the § 2S1.1(b)(2) inquiry the judge was to make at sentencing, and the same preponderance of the evidence standard of proof was applicable to the jury and the judge.

We need not decide if the district court erred in calculating Magluta's offense level using an amount greater than the $15 million figure that the jury found in its special forfeiture verdict, because we would not vacate the sentence even if the court did. Having reviewed the record, we are convinced that any error of that nature was harmless. See United States v. Hersh, 297 F.3d 1233, 1248 (11th Cir. 2002) (sentencing errors are reviewed for harmless error). During the

course of the sentencing hearing, the district court stated: "Should the Eleventh Circuit determine that the Court's reasoning [in arriving at the guidelines range] is in error, I would employ an upward departure to impose a sentence outside of the Guideline range under the applicable law to reach the same result. And that is a departure to offense level 43 requiring a life sentence." Sentencing Tr. at 691. In other words, the district court said that it would get to an offense level of 43 one way or the other.

The district court recognized that it "must impose a sentence within the Sentencing Guidelines unless [it] determines that there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." Sentencing Tr. at 692. After discussing the permissible grounds for upward departures, the district court concluded that, if necessary to get to an offense level of 43, an upward departure would be warranted in this case based on "the anomaly created by the obstruction" resulting in Magluta's 1996 acquittal, as well as other non-specified factors that were present in this case. Apparently, the anomaly the district court was referring to had to do with the fact that, through his illegal conduct, Magluta escaped the punishment he deserved for the criminal conduct he was tried for in his 1996 trial. In summing up, the district court stated that "the

30

bribery of jurors, the bribery of witnesses, so goes to the heart of our criminal justice system which is the foundation of our democracy that the egregious nature of the offense here could only be recognized by an upward departure, and that the present Sentencing Guidelines do not take it into consideration, and that for those reasons the Court would upward depart."[8] Sentencing Tr. at 694–95.

If the district court had upwardly departed, we would review that decision only for abuse of discretion. United States v. Melvin, 187 F.3d 1316, 1320 (11th Cir. 1999). Furthermore, "[b]ecause the district courts see so many Guidelines cases, district courts have an institutional advantage over appellate courts in determining whether a case is outside the heartland, and thus their decisions are entitled to substantial deference." Id. (citing Koon v. United States, 518 U.S. 81, 98, 116 S. Ct. 2035, 2046 (1996)). With that in mind, we cannot say that the district court would have abused its discretion in upwardly departing. See

_____

[8] Our reversal of Magluta's conviction for obstruction by bribing a juror does not undermine the factual premise of the district court's preemptive departure decision. Our reversal was based on our conclusion that the juror's out-of-court statements to the undercover agent were hearsay; that is, the statements did not fit within Fed. R. Evid. 801(d)(2)(E). However, it is well-established that, in sentencing, a district court can consider hearsay even if it was not admissible in determining guilt, so long as there are sufficient indicia of reliability. United States v. Wilson, 183 F.3d 1291, 1301 (11th Cir. 1999) ("A court may consider any information (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the information is sufficiently reliable."); U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); see also 18 U.S.C.A. § 3661. The tape-recorded statements of the juror to the undercover agent clearly have sufficient indicia of reliability for this purpose.

U.S.S.G. § 5K2.0 (describing permissible grounds for upward departures).  As a result, any two-point error in Magluta's offense level was harmless.

Magluta also contends that the district court erred in calculating his criminal history score.  Specifically, he asserts that the district court impermissibly considered his previous convictions as "prior sentences" under U.S.S.G. § 4A1.1(a).  This is error, Magluta says, because his previous convictions were all "part of the instant offense" under § 4A1.2(a)(1), even though they occurred before this trial began.  If Magluta were correct about this, his criminal history score was miscalculated.  We need not decide whether this argument has any merit, for much the same reason we did not have to decide whether Magluta's argument about his offense level had any merit.  The district court gave a valid basis for an upward departure to an offense level of 43 and that departure would not have been an abuse of discretion.  Because an offense level of 43 mandates a life sentence regardless of the criminal history category, U.S.S.G. ch. 5, pt. A, any error in the calculation of Magluta's criminal history score is harmless.

Magluta's next assertion is that the district court erred by ordering each of the sentences for his convictions to run consecutively pursuant to U.S.S.G. § 5G1.2(d).  He concedes that this position is foreclosed by our decision in United States v. Davis, 329 F.3d 1250 (11th Cir. 2003) (per curiam).  That decision held

§ 5G1.2(d) requires that sentences run consecutively to the extent necessary to reach the punishment range set by the guidelines. Id. at 1253–54. Magluta argues, however, that Davis has been invalidated by United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005). It has not been. Booker invalidated neither § 5G1.2(d) nor Davis. Instead, as one of our post-Booker decisions explained, Booker held that "the Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.) (emphasis omitted), cert. denied, ___ S. Ct. ___, 2005 WL 483174 (June 20, 2005). The Booker decision also established that it is "error for the district court to sentence [a defendant] under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." United v. Shelton, 400 F.3d 1325, 1330–31 (11th Cir. 2005). To remedy the situation, the Court in Booker effectively rendered the guidelines advisory. See Booker, 543 U.S. at ___, 125 S. Ct. at 764. The Booker decision affected Davis only to the extent that all guidelines decisions are now advisory. Davis' holding as to the proper application of § 5G1.2(d) remains correct and binding.

Magluta also makes the broader argument that he is entitled to resentencing

33

under Booker because he was sentenced under a mandatory guidelines system. This Booker argument was raised for the first time in Magluta's reply brief. As we indicated in our previous order granting in relevant part the government's motion to strike the portions of Magluta's reply brief raising this Booker argument, United States v. Magluta, No. 03-10694 (11th Cir. Nov. 17, 2004), an appellant may not raise an issue for the first time in a reply brief. See United States v. Vanorden, ___ F.3d ___, 2005 WL 1531151, *1 (11th Cir. June 30, 2005) (per curiam); United States v. Dockery, 401 F.3d 1261, 1262–63 (11th Cir. 2005) (per curiam); United States v. Ardley, 242 F.3d 989, 990 (11th Cir. 2001) (per curiam). As a result, Magluta has abandoned this argument.

However, even if Magluta's Booker argument had not been abandoned because of his failure to raise it in his initial brief, he would still not be entitled to resentencing. Having failed to raise that issue in the district court, our review would be only for plain error. Rodriguez, 398 F.3d at 1298. As part of satisfying the plain error test, a defendant "must establish a reasonable probability that if the district court had considered the guidelines range it arrived at using extra-verdict enhancements as merely advisory, instead of mandatory, and had taken into account any otherwise unconsidered § 3553 factors, the court would have imposed a lesser sentence than it did." Id. at 1302. There is no evidence at all in the record

34

to suggest that the district court would have imposed a lesser sentence than it did had it applied the guidelines in an advisory instead of mandatory manner. To the contrary, the court made it abundantly clear that it would have given Magluta a life sentence regardless.

## VII.

For the foregoing reasons, all of Magluta's convictions are AFFIRMED, except for the one for obstruction of justice through juror bribery, count 8, which is REVERSED. Magluta's sentence is VACATED, and the case is REMANDED.

If the government elects to dismiss count 8 instead of retry Magluta on that charge, or if a retrial on that count occurs and he is acquitted, the district court shall, at its discretion, either reimpose Magluta's sentence but with a reduction of 120 months as a result of there being no conviction for count 8, or the court may resentence Magluta on all the other counts for which he remains convicted. If the government elects to retry Magluta on count 8 and he is re-convicted of that charge, the district court shall then re-sentence him on all the counts.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED**.