**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4997

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DEONE ANTONIO MELVIN, a/k/a D,

Defendant - Appellant,

and

MARLON JERMAINE MCCORTER,

Claimant.

No. 05-4998

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ADRIAN ALEXANDER, a/k/a AD,

Defendant - Appellant,

and

MARLON JERMAINE MCCORTER,

Claimant.

No. 05-4999

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RAMONE STEPHON JONES, a/k/a Duggie,

Defendant - Appellant.

No. 05-5000

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEPHON MASON, a/k/a Step, a/k/a Step Dog,
a/k/a Dog,

Defendant - Appellant.

Appeals from the United States District Court for the District of
Maryland, at Greenbelt. Alexander Williams, Jr., District Judge.
(CR-03-321)

Argued: March 16, 2007          Decided: July 13, 2007

_____

Before MOTZ and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Sol Zalel Rosen, Washington, D.C., for Appellant Deone Antonio Melvin; John James Carney, Washington, D.C., for Appellant Adrian Alexander; Eric Matthew Glass, CLARK & GLASS, Rockville, Maryland, for Appellant Ramone Stephon Jones; Marc Lanny Resnick, Washington, D.C., for Appellant Stephon Mason. Jason M. Weinstein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this consolidated appeal, Deone Melvin, Adrian Alexander, Ramone Jones, and Stephon Mason raise numerous challenges to their convictions for various offenses related to drug trafficking, money laundering, and/or possession of firearms. Jones also challenges his sentence. Finding no reversible error, we affirm the district court's judgments.

I

A

Some time in 1997, Shahid Omar, who was running a drug distribution operation in Maryland, began to obtain cocaine in New York from Francisco Despiau. Despiau was a drug trafficker, with several sources of supply. He also outfitted vehicles with hidden compartments to help facilitate the transportation of drugs. Over time, Despiau sold several vehicles outfitted with hidden compartments to both Omar and Mason.

Despiau's first transaction with Omar involved two kilograms of cocaine. Thereafter, Omar made trips to New York every five to six days, purchasing on average between three and five kilograms of cocaine. On some of these trips, Omar was accompanied by Mason. On one occasion, Mason, accompanied by Jones, went to New York to retrieve from Despiau approximately $35,000, which was previously left as a deposit for cocaine that ultimately could not be obtained

at that time.  Mason and Jones were unsuccessful on this trip, but Mason returned to New York a few days later and retrieved the money.

Once the cocaine arrived in Maryland, Omar sold it to several customers, including Mason.  Mason in turn had customers of his own, including Aaron Harrod.  Harrod met Mason in 1999 and began purchasing cocaine from him.  During one of these transactions, Mason brought Omar along with him.  At the meeting, Harrod and Omar recognized each other, as they attended high school together. Based on this earlier acquaintance with Omar, Harrod began purchasing cocaine directly from Omar to avoid paying the middleman's premium charged by Mason.

On September 4, 1999, Harrod met Omar to consummate a three kilogram transaction.  Harrod approached Omar's vehicle and handed Mason, who was a passenger in the vehicle, $66,000.  Moments later, Omar shot Harrod seven to eight times, wounding him.  Omar was arrested and detained for the shooting.  Thereafter, Mason attempted to get $25,000 from Despiau to give to Harrod in exchange for Harrod's promise not to testify against Omar.  When Despiau asked Mason what he would do if Harrod testified, Mason responded that he would "do" Harrod to prevent him from testifying.  Harrod eventually received $25,000 and signed an affidavit stating that Omar did not shoot him. At Omar's trial, however, Harrod testified truthfully.

- 5 -

While Omar was incarcerated, Mason forged a direct relationship with Despiau. For his first transaction with Despiau, Mason traveled to New York with Jones and purchased 400 grams of cocaine. Thereafter, Mason purchased larger quantities of cocaine. For each of these transactions, Mason paid Omar a fee because Omar was responsible for finding Despiau as a source of cocaine.

In April 2000, law enforcement officers searched Mason's blue Ford Windstar. In the hidden compartment under the rear seat, the officers found a cache of weapons, including the gun that Omar had used to shoot Harrod. Following this search, Mason was arrested and incarcerated. As a result, Mason gave Melvin and Jones permission to contact Despiau, so that they could obtain cocaine from Despiau while Mason was incarcerated.

While Mason was incarcerated, Melvin and Jones traveled regularly, by themselves and with others, to buy cocaine from Despiau. On average, Melvin and/or Jones picked up approximately ten kilograms of cocaine per week. On one occasion, they purchased approximately thirty kilograms of cocaine. Melvin and Jones also obtained from Despiau numerous vehicles containing hidden compartments. Most if not all of the vehicles were placed in names other than those of the true users.

Melvin and Jones were assisted by drivers who picked up cocaine from, and delivered drug money to, Despiau. Melvin used Alexander as a driver, while Jones used Bennie Wilder.

In letters that Mason wrote to Melvin and Jones from jail, Mason insisted that Melvin and Jones pay him a fee every time they obtained cocaine from Despiau. In the late summer of 2002, Mason was released from jail and immediately began to purchase cocaine from Despiau. Between the summer of 2002 and the spring of 2003, Melvin, Mason, and Jones together distributed at least eighty kilograms of cocaine. Mason distributed some cocaine and cocaine base (crack) that he prepared in a microwave to Brian Elzey. Wilder also purchased cocaine from Mason in order to "cook" it into crack for resale.

By the spring and summer of 2003, Jones and Mason ran up such huge debts--Jones owing as much as $100,000, while Mason owed approximately $40,000--that Despiau cut off their supply of cocaine and sought to collect the money owed to him from prior deals. Melvin, Jones, Mason, and Alexander became increasingly frustrated by their inability to get more cocaine from Despiau and looked for alternate sources of supply.

During the summer of 2003, the Drug Enforcement Administration (DEA) intercepted conversations occurring over telephones utilized by Mason and Melvin, including numerous conversations concerning the sale and purchase of cocaine. Melvin and Alexander were overheard discussing which vehicles with hidden compartments should be taken to New York for the purpose of bringing back cocaine and strategies for avoiding police detection during these trips.

- 7 -

Melvin, Jones, Mason, Alexander, and others discussed how they could pay off the debts owed to Despiau and how soon thereafter they would be able to get more cocaine. Melvin and Jones discussed an incident in which Alexander had fled from police after being stopped because he had a gun in the glove compartment. Alexander, in another intercepted call, described an incident in which he was shot at and had to go to his vehicle to retrieve a gun and return fire. Other intercepted conversations concerned weapons and the titling of vehicles and assets in the names of other persons, including Audrey Melvin (Deone Melvin's mother) and Derrick Tobias.

At the culmination of the investigation, on July 31, 2003, Melvin, Jones, and Mason were arrested, along with other codefendants. Law enforcement officers also executed search warrants at multiple locations. The officers found a Glock .45 caliber pistol in Melvin's bedroom at the apartment he shared with Jones in Upper Marlboro, Maryland. During wiretapped calls, Melvin and Jones discussed placing guns at the home of Dana Dark at 4310 Lavender Lane in Bowie, Maryland, because of their concerns that law enforcement might search their apartment. At the Lavender Lane location, the officers recovered a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol.

In an area of Audrey Melvin's home utilized by Deone Melvin, agents found a rifle, a digital scale with cocaine residue, a Pyrex

dish with crack residue, and other materials used for the packaging and cooking of cocaine, as well as a money counter. Upon his arrest, Melvin voluntarily waived his Miranda[1] rights and agreed to be interviewed by law enforcement officers.

At Mason's home at 415 Aragona Drive in Fort Washington, Maryland, law enforcement officers recovered a .38 caliber revolver with an obliterated serial number. In the hidden compartment of the blue Ford Explorer parked at the home, the officers found approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol.

In December 2003, law enforcement officers located Alexander at his girlfriend's home. In a Chevrolet Tahoe registered to Alexander's brother, but used by Alexander, the officers found a Heckler & Koch .40 caliber handgun.

B

On November 13, 2003, by way of a superseding indictment, Melvin, Jones, Mason, and Alexander were charged, along with twelve others, in a fifteen-count indictment returned by a federal grand jury sitting in the District of Maryland. In Count One, Melvin, Jones, Mason, and Alexander were charged, with several others, with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of crack, 21 U.S.C. §§ 841(a)(1) and 846. In Count Three,

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

Melvin, Jones, and Mason were charged with conspiracy to commit money laundering, 18 U.S.C. § 1956(h). This count was premised on the numerous transactions where members of the conspiracy acquired vehicles and titled those vehicles in other people's names (usually relatives) to hide the facts that those vehicles were acquired with drug proceeds and used by the members of the conspiracy. In Counts Four and Six, respectively, Jones and Mason were charged with money laundering, and aiding and abetting the same, id. §§ 2 and 1956(a)(1). These counts related to the acquisition and titling of two Ford Explorers. In Count Five, Melvin was charged with distribution of cocaine, and aiding and abetting the same, id. § 2, 21 U.S.C. § 841(a)(1). This count related to a drug transaction involving Melvin. In Counts Eight, Nine, and Ten, Melvin was charged with possession of a firearm in furtherance of a drug trafficking crime, and aiding and abetting the same, id. § 2, 21 U.S.C. § 924(c)(1). Of note, Count Nine related to the firearms found in Melvin's bedroom at the apartment he shared with Jones, and Count Ten related to the firearms recovered at Lavender Lane. Jones was also charged with a § 924(c)(1) offense in Count Ten relating to the firearms found at Lavender Lane. Melvin (in Count Eleven), Jones (in Count Twelve), and Mason (in Counts Thirteen and Fourteen) were charged with possession of a firearm by a convicted felon, and aiding and abetting the same, 18 U.S.C. §§ 2 and 922(g)(1). Count Eleven related to the rifle found in Audrey

Melvin's home in an area used by Melvin; Count Twelve related to the firearms found at Lavender Lane; and Counts Thirteen and Fourteen related to the firearms found at Mason's home.

Following a jury trial, Melvin was convicted of Counts One and Five; however, the jury found that Melvin's Count One conspiracy offense only involved the distribution of cocaine. The jury found Melvin not guilty on Count Eight and was deadlocked on the remaining counts. Jones was found guilty of the money laundering conspiracy charged in Count Three, and the jury was deadlocked on the remaining counts. Mason was found guilty of only one of the § 922(g)(1) counts (Count Fourteen), and the jury was deadlocked as to the remaining counts. As to Alexander, the jury was unable to reach a verdict.

In view of the mixed verdict on the superseding indictment, the government returned a thirteen count second superseding indictment. In Count One, Jones, Mason, and Alexander were charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of crack, 21 U.S.C. §§ 841(a)(1) and 846. This count was premised on the same conduct that formed the basis of Count One of the superseding indictment. In Count Three, Melvin and Mason were charged with conspiracy to commit money laundering, 18 U.S.C. § 1956(h). The allegations in this count essentially mirrored the allegations in Count Three of the superseding indictment. Jones

(in Count Four) and Mason (in Count Five) were charged with money laundering, and aiding and abetting the same, id. §§ 2 and 1956(a)(1). Each of these counts related to the acquisition of a Ford Explorer. Melvin (in Counts Six and Seven), Jones (in Count Seven), and Mason (in Count Eleven) were charged with possession of a firearm in furtherance of a drug trafficking crime, and aiding and abetting the same, id. § 2, 21 U.S.C. § 924(c)(1). Count Six related to the firearms found in Melvin's bedroom in the apartment he shared with Jones, and Count Seven related to the firearms recovered at Lavender Lane. Count Eleven related to the firearms recovered at Mason's home. Melvin, Jones, and Alexander each were charged with one § 922(g)(1) violation in Counts Eight, Nine, and Thirteen, respectively. Count Eight related to the rifle found in Audrey Melvin's home in an area used by Melvin; Count Nine related to the firearms found at Lavender Lane; and Count Thirteen related to the firearm recovered from Alexander's Tahoe. In Count Ten, the government charged Mason with possession of cocaine with the intent to distribute, 21 U.S.C. § 841(a)(1). This count related to the cocaine recovered from the Ford Explorer parked in front of Mason's home on July 31, 2003. The second superseding indictment also contained a forfeiture allegation.[2]

---

[2]Count Two of both the superseding indictment and the second superseding indictment related to allegations that Mason and others were involved in a conspiracy to distribute crack and PCP. Ultimately, Count Two of the second superseding indictment was dismissed by the government.

Following a second jury trial, a jury convicted the appellants of the counts outlined above. Melvin received concurrent sentences of 180 months' imprisonment on Counts One and Five of the superseding indictment and Count Three of the second superseding indictment; a 120 month concurrent sentence on Count Eight of the second superseding indictment; a five year consecutive sentence on Count Six of the second superseding indictment; and a twenty-five year consecutive sentence on Count Seven. Jones received a 300 month sentence on Count One of the second superseding indictment; a 240 month concurrent sentence on Count Three of the superseding indictment; a 240 month concurrent sentence on Count Four of the second superseding indictment; a 120 month concurrent sentence on Count Nine of the second superseding indictment; and a five year consecutive sentence on Count Seven of the second superseding indictment. Mason received a life sentence on Count One of the second superseding indictment; a 240 month concurrent sentence on Count Three of the second superseding indictment; a 240 month concurrent sentence on Count Five of the second superseding indictment; a 360 month concurrent sentence on Count Ten of the second superseding indictment; a five year consecutive sentence on Count Eleven of the second superseding indictment; and a 120 month concurrent sentence on Count Fourteen of the superseding indictment. Alexander received a 295 month sentence on Count One of the second superseding indictment and a 120 month concurrent

sentence on Count Thirteen of the second superseding indictment. Each appellant noted a timely appeal.

## II

The appellants, individually and collectively, raise several challenges to the district court's denial of their motions for severance. Melvin, Alexander, and Jones argue that their cases should have been severed from Mason's case because the evidence concerning the shooting and robbery of Harrod unfairly prejudiced their respective cases. Melvin contends that he was entitled to have his case severed from the cases of the other three appellants because his acquittal in the first trial of being involved in a conspiracy to distribute crack precluded the government from including him in a second trial where the defendants were charged with conduct he was acquitted of in the first trial.

### A

The Supreme Court has indicated that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537, (1993). Under Rule 14(a) of the Federal Rules of Criminal Procedure, if the joinder of defendants for trial appears to prejudice a defendant, a district court may sever the defendants' trials or provide any other relief that justice requires. Fed. R. Crim. P. 14(a). Accordingly, severance under Rule 14 is warranted

- 14 -

only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  The defendant must "establish that actual prejudice would result from a joint trial, . . . and not merely that a separate trial would offer a better chance of acquittal."  United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995) (citation and internal quotation marks omitted). The "prejudice must be of a type against which the trial court was unable to afford protection."  United States v. Faulkner, 17 F.3d 745, 759 (5th Cir. 1994) (citation and internal quotation marks omitted).  Finally, we review the district court's rulings on severance and mistrial claims for an abuse of discretion, United States v. West, 877 F.2d 281, 287-88 (4th Cir. 1989), and factual findings made in conjunction with these claims are reviewed for clear error, United States v. Smith, 44 F.3d 1259, 1269 (4th Cir. 1995).

B

Jones and Alexander contend that they were entitled to severance because the government decided to introduce evidence at trial involving the shooting of Harrod.  We disagree.

Most of the testimony of the witnesses at trial concerned the distribution of drugs rather than the shooting of Harrod.  Thus, the evidence concerning the Harrod shooting was not the highlight

of the government's case on Count One, though it was plainly relevant to the government's claim that the conspiracy started with Omar and Mason and continued with the addition of Jones and Alexander.  The relevancy of the evidence unquestionably counsels against severance.  Moreover, any prejudice flowing from the admission of the Harrod shooting evidence was substantially diminished by the evidence that Jones and Alexander possessed firearms.  Finally, judicial economy considerations weigh in favor of a joint trial here.  The case involved numerous defendants, a multi-count indictment, and a multi-week trial with numerous witnesses and substantial physical evidence.  In order to completely shield Jones and Alexander from the potentially prejudicial effect of the Harrod shooting evidence, the district court would have had to order a separate trial and many of the witnesses would have had to testify in multiple proceedings.  The need to avoid such wasteful expenditure of judicial resources is the basis for the default rule that conspirators should be tried together. Cf. United States v. Pepe, 747 F.2d 632, 651 (11th Cir. 1984) (stating that judicial economy weighed "heavily" against severance in a case involving six defendants, a seven-count indictment, and a five-week trial).[3]

---

[3]Melvin argues that the spillover effect of the Harrod shooting evidence prejudiced his case.  We find no merit to Melvin's argument.

- 16 -

Melvin contends that he was entitled to severance at the second trial because he was acquitted at the first trial of engaging in a conspiracy to distribute fifty grams or more of crack. According to Melvin, because of his partial acquittal on Count One, the government "was collaterally estopped from raising the issue of 'crack' cocaine in relation to . . . Melvin." Appellant's Br. at 12.

For criminal purposes, the doctrine of collateral estoppel derives from the Fifth Amendment's guarantee against double jeopardy. Ashe v. Swenson, 397 U.S. 436, 445 (1970). As the Court explained in Ashe, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 443. Similarly, as we have held previously, "[d]ouble jeopardy is a constitutional bar not only to retrial for the same offense, but also to relitigation of adjudicated issues whether they emerge in trials for the same or distinct offenses." United States v. Nash, 447 F.2d 1382, 1384 (4th Cir. 1971). Although the doctrine of collateral estoppel was first developed in the realm of civil litigation, it now constitutes a fixed principle of federal criminal law. See United States v. Oppenheimer, 242 U.S. 85, 87, (1916) ("It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those

that protect from a liability in debt."). Collateral estoppel is not to be applied mechanically, however, but only with "realism and rationality." Ashe, 397 U.S. at 444.

In United States v. Fiel, 35 F.3d 997 (4th Cir. 1994), we identified the five elements relevant to a collateral estoppel claim. They are:

> (1) whether the issue in question is identical to the previous issue;
>
> (2) whether it was actually determined in the prior adjudication;
>
> (3) whether it was necessarily decided in that proceeding;
>
> (4) whether the resulting judgment settling the issue was final and valid; and
>
> (5) whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding.

Id. at 1006. In order for a criminal prosecution to be barred by collateral estoppel under the Fiel test, each of these five elements must be resolved in the movant's favor. United States v. Ruhbayan, 325 F.3d 197, 202 (4th Cir. 2003). In seeking relief here, Melvin contends that the Fiel test is satisfied.

In assessing a collateral estoppel claim, a reviewing court is obliged to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks

to foreclose from consideration." Fiel, 35 F.3d at 1006 (citation and internal quotation marks omitted).

In the second trial, Melvin was not charged in Count One, the drug conspiracy count. He was charged with participating in a § 1956(h) money laundering conspiracy, two violations of § 924(c)(1), and one § 922(g)(1) violation. The unlawful activity listed in the money laundering count was the distribution of "controlled substances." The predicate drug offense in Melvin's § 924(c)(1) counts was the conspiracy "charged in Count One of [the] Second Superseding Indictment, to wit, conspiracy to distribute and to possess with intent to distribute controlled substances." In its instructions to the jury on Melvin's § 924(c)(1) counts, the district court made it clear that the drug offense involved in those counts involved only cocaine. The court instructed the jury that it was

> not being asked to determine whether . . . Melvin is actually guilty of the drug conspiracy charged in Count One . . . , [rather] for purposes of determining his guilt or innocence as to Counts Six or Seven, you should first determine whether he participated in a conspiracy to distribute or possess with intent to distribute powder cocaine.

In our view, the government was not collaterally estopped from introducing evidence against Melvin related to the distribution of crack by Melvin or others. The jury in the first trial did not acquit Melvin of distributing crack; rather, it acquitted him of conspiring with others to do so. Therefore, the only issue the

- 19 -

government was prevented from relitigating was whether Melvin entered into an agreement with others to distribute crack. Unfortunately for Melvin, none of the offenses he was charged with in the second superseding indictment required the jury to determine if he agreed with others to distribute crack.

To be sure, the § 922(g)(1) count, as all parties seem to concede, has nothing to do with crack. Cf. United States v. Moye, 454 F.3d 390, 395 (4th Cir.) (en banc) (noting that the elements required for conviction under § 922(g)(1) are: (1) the defendant previously had been convicted of a crime punishable by a term of imprisonment exceeding one year; (2) the defendant knowingly possessed, transported, shipped, or received, the firearm; and (3) the possession was in or affecting commerce, because the firearm had traveled in interstate or foreign commerce at some point during its existence), cert. denied, 127 S. Ct. 452 (2006). With regard to the money laundering conspiracy count, to establish that Melvin participated in the alleged money laundering conspiracy, the government was required to prove (1) that there was an agreement between two or more persons to engage in financial transactions involving the proceeds from the distribution of cocaine and/or crack and (2) that Melvin joined the agreement knowing its purpose and with the intent to further the illegal purpose. United States v. Meshack, 225 F.3d 556, 573-74 (5th Cir. 2000). As part of its burden of proof, the government was required to demonstrate the

existence of an unlawful activity that involved the distribution of either cocaine or crack.  As such, the evidence concerning the distribution of crack was relevant to the government's burden of proving the existence of an unlawful activity.  Of course, the government was not required to prove that Melvin distributed cocaine and/or crack.  All the government was required to prove was that Melvin, with the requisite knowledge and intent joined a conspiracy whose aim was to conduct a financial transaction involving the proceeds of an unlawful activity and that the unlawful activity involved the distribution of either cocaine or crack by Melvin or others.  Cf. United States v. Magluta, 418 F.3d 1166, 1174 (11th Cir. 2005) (holding that the defendant's guilt of the criminal activity charged in the earlier case was not an element of the money laundering charges he was convicted of in the second case, as the government did not have to prove that defendant personally committed the felony drug offenses, only that, with the requisite knowledge and intent, he conducted a financial transaction involving the proceeds of felony drug offenses), cert. denied, 126 S. Ct. 2966 (2006).  Accordingly, whether Melvin entered into an agreement to distribute crack had nothing to do with the jury's resolution of the money laundering conspiracy count.

Finally, with regard to the § 924(c)(1) counts, the district court's limiting instruction ensured that the jury did not resolve

any question concerning crack as it related to Melvin. Indeed, the jury was instructed only to resolve the question of whether Melvin possessed the firearms in furtherance of a conspiracy to distribute cocaine. Thus, the evidence of the distribution of crack played no role in the jury's resolution of Melvin's § 924(c)(1) counts and, therefore, the doctrine of collateral estoppel has no application to the jury's consideration of these counts.

III

Alexander challenges several aspects of the district court's ruling denying his motion to suppress. The facts of this issue are as follows.

On December 2, 2003, law enforcement officers observed a gold 2002 Chevrolet Tahoe used by Alexander parked outside of 4019 Cooper's Lane, Hyattsville, Maryland, the residence of Alexander's girlfriend. At that time, Alexander was a fugitive, with an open arrest warrant based on the indictment returned on July 9, 2003. Although the Tahoe was registered to Alexander's brother, Alexander previously had been seen driving the vehicle on multiple occasions, including during meetings with Melvin.[4] Believing that Alexander might be inside his girlfriend's house, the officers returned the

---

[4]The law enforcement officers also had a reasonable basis to believe that the Tahoe was used by Alexander during the course of the conspiracy to take Melvin to New York to acquire cocaine from Despiau.

next day, December 3, and again spotted the Tahoe parked at that address.

The assembled law enforcement officers waited outside the residence, but Alexander failed to appear, and no one responded to knocks on the door. The officers decided to seize the Tahoe and called for a tow truck. The tow truck triggered the Tahoe's alarm. Shortly after the Tahoe was towed away to the impound lot, Alexander emerged from the residence, carrying the keys to the Tahoe. Alexander was placed under arrest pursuant to the open warrant. The law enforcement officers did not administer Miranda warnings. Because Alexander was not wearing shoes or a jacket, the officers took him inside the residence to get out of the cold while they waited for Special Agent Cindy Buskey of the Drug Enforcement Administration, who had followed the Tahoe and the tow truck to the impound lot, to return and take custody of Alexander.

While Alexander was being escorted toward the residence, he was not questioned by the law enforcement officers. However, on his own, Alexander indicated that he "knew the sheriff's department was looking for him." He also repeatedly asked Detective Shawn Scarlata of the Prince George's County Police Department, "Where's my truck, What happened to my truck?"

Once in the residence, Detective Scarlata asked Alexander if there were any other persons in the residence or if there were any weapons present. Alexander indicated that there were no other

people or weapons in the residence. Detective Scarlata also asked Alexander if there was "anything the agents needed to know about in the truck," to which Alexander responded, "No. What truck are you talking about? What truck?"

Upon Special Agent Buskey's return, and without being questioned, Alexander volunteered that the alarm system on his truck keys monitored the Tahoe and had alerted him of its seizure. Special Agent Buskey explained to Alexander that he was under arrest for his activities with Melvin and would be taken to the courthouse in Greenbelt. Alexander's immediate response was, "You can't get arrested for driving around with somebody or letting somebody use your car."

Detective Harold Black of the Prince George's County Police Department and another detective then drove Alexander to the United States Courthouse in Greenbelt. Without prompting or questioning by either detective, Alexander volunteered that he knew law enforcement had been looking for him because he had seen an indictment; that the indictment described a phone conversation between Alexander and Melvin which had taken place while Alexander had been on vacation with his girlfriend in Hawaii; and that, because Alexander knew that Melvin was "hot," he had stopped hanging out with Melvin. Mistakenly believing that Alexander had already received Miranda warnings, Detective Black then began to ask Alexander questions, including questions about how long he had

known Melvin. In response to one of these questions, Alexander indicated that he had known Melvin since high school.

At trial, the government introduced all of the statements outlined above.

A

Alexander first challenges the seizure of the Tahoe. Section 881(a)(4) of Title 21 declares that vehicles "which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances]" are forfeitable to the United States. 21 U.S.C. § 881(a)(4). The government must establish probable cause amounting to more than a mere suspicion to believe the property was used to facilitate drug transactions. United States v. Premises Known as 3639-2nd St. N.E., Minneapolis, Minnesota, 869 F.2d 1093, 1095 (8th Cir. 1989). Once the government makes this showing, the burden shifts to the defendant to show the property is not subject to forfeiture or that a defense to forfeiture exists. Id. A forfeiture occurs at the time of the unlawful act, although the seizure may not occur until some time later. United States v. One 1978 Mercedes Benz, Four-Door Sedan, VIN: 116-036-12-004084, 711 F.2d 1297, 1302 (5th Cir. 1983) (holding that § 881 does not place any time limitation on forfeiture of property, and car seized three months after used in illegal transaction valid); United States v. Kemp, 690 F.2d 397,

- 25 -

401 (4th Cir. 1982) (seizure of vehicle for forfeiture need not be contemporaneous with events giving law enforcement officials probable cause for forfeiture).

In this case, the second superseding indictment contained a forfeiture allegation, seeking, inter alia, the forfeiture of all property used to facilitate the commission of the conspiracy alleged in Count One. Moreover, law enforcement officers had surveilled Alexander in the Tahoe on multiple occasions, including when meeting with Melvin, prior to December 3, 2003. The officers also knew from wiretaps and surveillance that Alexander and his codefendants had discussed using new or different vehicles for their trips to New York to obtain drugs and to deliver drug money and that Alexander's role in the conspiracy included driving and/or otherwise arranging transportation for these drug acquisition trips. Under these circumstances, we agree with the district court that there was probable cause to support the warrantless seizure of the Tahoe and that the subsequent inventory search of the vehicle was proper. See Cooper v. California, 386 U.S. 58, 61-62 (1967) (holding that, when a vehicle is seized for forfeiture purposes, a warrantless inventory search can be made); United States v. Alvarez, 833 F.2d 724, 728 (7th Cir. 1987) (holding that, once a vehicle is seized for forfeiture, it can be searched without a warrant).

Alexander next challenges the admissibility of the statements he made to law enforcement. The challenged statements can be categorized as follows: Group One: Alexander's statements (in the form of questions) to Detective Scarlata, "Where's my truck, What happened to my truck?"; Group Two: Alexander's statements (in the form of questions) to Detective Scarlata, "What truck are you talking about? What truck?"; Group Three: Alexander's explanation to Special Agent Buskey concerning how the Tahoe's alarm worked; Group Four: Alexander's statement to Special Agent Buskey, "You can't get arrested for driving around with somebody or letting somebody use your car"; Group Five: Alexander's statements to Detective Black that he knew law enforcement had been looking for him because he had seen an indictment; that he knew the indictment described a phone conversation between Alexander and Melvin; and that he had stopped hanging out with Melvin because he was "hot"; and Group Six: Alexander's statement to Detective Black that he had known Melvin since high school.

In Miranda, the Court held that, prior to interrogating a suspect who is in custody, the suspect must be advised of certain rights in order to protect his Fifth Amendment right against self-incrimination. 384 U.S. at 467-68. Thus, in order to claim a Miranda violation, a suspect must have been in custody and the suspect must have been interrogated. Thompson v. Keohane, 516 U.S.

99, 102 (1995). The term "interrogation" under <u>Miranda</u> refers not only to express questioning but also "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).

With regard to Alexander's statements in Groups One, Three, Four, and Five, it is clear that these statements were not made in response to any police interrogation. Therefore, these statements were admissible under <u>Miranda</u> and <u>Innis</u>.

Turning to Alexander's statements in Group Two (in the form of questions, "What truck are you talking about? What truck?"), the government contends that these statements were made in response to valid safety related questions concerning the truck.

In <u>New York v. Quarles</u>, 467 U.S. 649 (1984), the Supreme Court established a narrow exception to <u>Miranda</u> for situations where there is a threat to public safety. <u>Id.</u> at 657-58. The public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public. <u>Id.</u> at 655-58. For example, in <u>Quarles</u>, an armed suspect ran into a crowded supermarket where he was apprehended by the police. <u>Id.</u> at 651-52. The officers searched the suspect and found an empty shoulder harness. <u>Id.</u> at 652. Without first giving <u>Miranda</u> warnings, they asked him where he had

put the gun.  Id.  The suspect told the officers that the gun was under some empty cartons in the store, and the gun was recovered. Id.  The Court held that, even though the suspect was handcuffed and posed no threat to the officers when questioned, the interrogation was permissible because the gun created a clear danger to the public.  Id. at 657.  The Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."  Id.  The exception to Miranda also applies where there is a threat to the officers rather than the public.  Id. at 659.

In United States v. Mobley, 40 F.3d 688 (4th Cir. 1994), we applied Quarles.  In that case, agents executing arrest and search warrants asked Mobley, after he invoked his right to counsel, whether "there was anything in the apartment that could be of danger to the agents who would be staying to conduct the search warrant, such as a weapon."  Id. at 691.  In response to the question, Mobley stated that there was a weapon in the bedroom closet on one of the shelves, and he led the agents to it.  Id. Emphasizing that Quarles stated "an exception to the Miranda rule," we cautioned against applying it in "an ordinary and routine arrest scenario."  Id. at 693.  We noted that, absent circumstances "posing an objective danger to the public or police, the need for

the exception is not apparent, and the suspicion that the questioner is on a fishing expedition outweighs the belief that public safety motivated the questioning that all understand is otherwise improper." Id. Noting that the apartment had already been secured, that Mobley was the only person present, and that no one else lived there, we held that there was "no demonstration of an 'immediate need' that would validate protection under the Quarles exception." Id.

In this case, under Mobley, the government failed to demonstrate an immediate need that would validate protection under the Quarles exception. The Tahoe was already on its way to its impound lot, and the government did not admit evidence that the public had access to the impound lot so as to create a public danger. In the absence of such evidence, we are constrained to conclude that Alexander's Group Two statements were improperly admitted at trial.

With regard to Alexander's statement that he had known Melvin since high school (Group Six statement), the government does not directly address this statement in its brief. However, it is clear to us that this statement should not have been admitted at trial. Alexander was in custody at the time and should not have been questioned by Detective Black concerning his relationship with Melvin.

The only remaining question, then, is whether the admission of the Group Two and Group Six statements is harmless error. See Correll v. Thompson, 63 F.3d 1279, 1291 (4th Cir. 1995) (applying harmless error standard to Miranda/Edwards violation); Mobley, 40 F.3d at 694 (holding that statement obtained in violation of Miranda was harmless error where other evidence at trial clearly established guilt).[5]

In our view, the error in the admission of the Group Two and Group Six statements is harmless. The government's case against Alexander on the drug conspiracy count (Count One) was unquestionably strong. Alexander was Melvin's driver and made

_____

[5]To the extent Alexander's argument might be construed as a claim that, because his Group Two statements are inadmissible, his subsequent Group Three, Four, and Five statements are so tainted that they too are inadmissible, we note that the Supreme Court has rejected this argument. See United States v. Patane, 542 U.S. 630, 642 (2004) (plurality opinion) (holding that Miranda is not subject to the fruit of the poisonous tree doctrine); Oregon v. Elstad, 470 U.S. 298, 309 (1985) (holding that a statement obtained in violation of Miranda does not, by its own force, mandate the inadmissibility of subsequent, similar statements that were constitutionally obtained); see also Miranda, 384 U.S. at 478 ("[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected"); United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (holding that later voluntary statement was admissible even when earlier statements must be suppressed). Moreover, to the extent Alexander contends that his Group Three, Four, and Five statements are involuntary, we reject this argument as well. These statements were knowingly and voluntarily made on Alexander's own initiative. Finally, even assuming that the Group Three, Four, and Five statements were tainted by the law enforcement officers' earlier, unwarned, custodial interrogation of Alexander, their admission would be harmless error for the same reasons, as explained infra, that the admission of the Group Two and Group Six statements is harmless error.

numerous trips to New York to assist in the acquisition of cocaine. Numerous wire intercepts demonstrated that Alexander was a major participant in the conspiracy. With regard to Alexander's § 922 (g)(1) conviction (Count Thirteen), the government's evidence was equally overwhelming. The government presented evidence that the Tahoe was parked at Alexander's girlfriend's residence, and Alexander was seen on numerous occasions driving the truck. At the time the Tahoe was seized, Alexander repeatedly asked Detective Scarlata questions concerning the whereabouts of his truck. He also implied to Special Agent Buskey that the truck was his. Alexander possessed the keys to the truck at the time of the seizure and was familiar with the truck's alarm system. The government also presented evidence that vehicles used as part of the conspiracy were often titled in the names of relatives of the coconspirators. Moreover, on several occasions, Alexander discussed the possession/use of weapons with his coconspirators. That Alexander possessed the weapon recovered during the inventory search of the Tahoe simply was never seriously in doubt. In sum, in view of the evidence properly admitted at trial, we conclude that the admission of the Group Two and Group Six statements is harmless error.[6]

---

[6]We also find no merit to Alexander's argument that there is insufficient evidence to support his conviction on Count Thirteen.

IV

Following his arrest, Melvin made several statements after waiving his <u>Miranda</u> rights. In particular, Melvin made statements about his distribution of crack. He also made statements to the effect that he knew that one of his customers, Jamere Hall, was cooperating with law enforcement; that he had been kidnapped in the course of his drug-trafficking activities; and that he owned guns and expensive watches. At trial, the government offered these statements as admissions against Melvin's interest, <u>see</u> Fed. R. Evid. 801(d)(2)(A), and, at the conclusion of the trial, the district court gave the following limiting instruction:

> You are cautioned that the evidence of one defendant's statement to the authorities after his arrest about his own conduct may not be considered or discussed by you in any way with respect to any defendant on trial other than the defendant who made the statement.

Jones, Mason, and Alexander argue that Melvin's statements directly implicated them and therefore were inadmissible under <u>Bruton v. United States</u>, 391 U.S. 123 (1968). Under <u>Bruton</u>, the Sixth Amendment prohibits the use, at a joint trial, of an out-of-court confession by a nontestifying defendant against his codefendant if the confession directly incriminates the codefendant as well. <u>Id.</u> at 126. However, "[a] <u>Bruton</u> problem exists only to the extent that the codefendant's statement in question, on its face, implicates the defendant." <u>United States v. Locklear</u>, 24 F.3d 641, 646 (4th Cir. 1994). As long as the nontestifying

defendant's statement does not on its face inculpate the codefendant, it is admissible, even it if it becomes incriminating when linked with other evidence. See Richardson v. Marsh, 481 U.S. 200, 208-09 (1987).

Unfortunately for Jones, Mason, and Alexander, Melvin's statements did not facially incriminate them. His statements mention no other appellant, whether by name, description, or role. In fact, the only other person mentioned by Melvin by name was Jamere Hall. Thus, Melvin's statements must be linked to other evidence in order to incriminate the appellants. Under such circumstances, the admission of Melvin's statements did not run afoul of Bruton, as interpreted by the Supreme Court in Richardson.

V

The appellants also challenge the admission of a firearm seized during a vehicle search following a traffic stop of Jones and Alexander. The facts concerning this issue are as follows.

On January 25, 2002 at 3:30 a.m., Officer Scott Yankowy of the Greenbelt Police Department detected on radar a vehicle speeding at seventy-eight miles per hour in a posted fifty mile per hour zone. The vehicle did not stop when Officer Yankowy pursued it for at least a mile while displaying his lights and using his siren. The driver, Jones, parked in a secluded, poorly-lit area with sparse to no traffic. Jones exited the vehicle and walked towards Officer

- 34 -

Yankowy in his car, until the officer drew his weapon and told Jones to stay in his car and ordered all three men in the car to keep their hands in plain view. Officer Yankowy noticed the back seat passenger, Alexander, make a movement towards the floorboard of the car.

Once police backup had arrived and the three men were removed from the car, Officer Yankowy noticed in plain view in the back seat what he recognized as a "Slim Jim" burglary tool. A search of the entire vehicle ensued, leading to the discovery of a loaded .45 caliber handgun in the glove compartment of the vehicle, as well as drug paraphernalia located in a grocery bag in the passenger compartment. The gun had a fully-loaded magazine containing five rounds, with a sixth round loaded in the chamber and ready to fire. The vehicle was titled in the name of Audrey Melvin, the mother of Deone Melvin.

At trial, the government offered evidence of the traffic stop, the arrest of the vehicle occupants, and the discovery of the firearm and drug paraphernalia. An objection was lodged against the admission of this evidence, which the district court overruled.

"[E]vidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy are not extrinsic evidence, <u>i.e.</u>, evidence of other acts, for purposes of Rule 404(b)." <u>United States v. Garcia Abrego</u>, 141 F.3d 142, 175 (5th Cir. 1998) (citation and internal

quotation marks omitted). "Acts committed in furtherance of the charged conspiracy are themselves part of the act charged." Id. "Thus, evidence of such acts constitutes intrinsic evidence--that is, direct evidence of the charged conspiracy itself." Id.

In this case, the circumstances of the stop, including the fact that the vehicle was titled in Audrey Melvin's name, was properly offered in connection with Count Three of the second superseding indictment, the money laundering conspiracy count; indeed, this incident was charged as an overt act in that count. Second, the stop, and, in particular, the fact that Jones and Alexander were stopped in a car titled in Melvin's mother's name with a firearm and drug paraphernalia, was properly offered as direct evidence of their participation in the drug conspiracy charged in Count One of the second superseding indictment. Accordingly, the district court did not err in admitting this evidence as evidence intrinsic to the conspiracies charged in Counts One and Three.


VI

Alexander also argues that the district court erred in admitting evidence of his prior felony conviction for transportation of a firearm. Prior to trial, Alexander offered to stipulate to his prior felony conviction for purposes of establishing his felon status under § 922(g)(1). The government

agreed to stipulate to the fact of Alexander's prior conviction, but also sought to introduce the circumstances of the conviction as Rule 404(b) evidence on the issue of Alexander's knowledge. The district court permitted the government to introduce a description of the circumstances surrounding the conviction under Rule 404(b) and gave a limiting instruction to the jury.

On appeal, Alexander argues that district court was obligated to accept his stipulation and was required to bar any evidence concerning the prior conviction, relying on <u>Old Chief v. United States</u>, 519 U.S. 172 (1997). This argument is without merit.

The Supreme Court held in <u>Old Chief</u> that the district court abused its discretion in refusing a defendant's offer to stipulate to his status as a felon under § 922(g)(1) because the risk of prejudice outweighed the probative value of the prior-conviction evidence. 519 U.S. at 191. Courts have recognized, however, that <u>Old Chief</u> does not control a case where the prior conviction evidence is offered to prove an issue which Rule 404(b) specifically permits to be proven by other crimes evidence, assuming the issue is relevant and subject, of course, to Rule 403 balancing. <u>See, e.g.</u>, <u>United States v. Frazier</u>, 280 F.3d 835, 846-48 (8th Cir. 2002) (holding that <u>Old Chief</u> does not bar evidence admitted to prove issue specifically authorized by 404(b)). Here, the circumstances surrounding Alexander's prior conviction, which involved possession of a firearm, was admitted under Rule 404(b) to

establish Alexander's knowing and intentional possession of the weapon recovered in the Tahoe. Because this was a permissible use of Rule 404(b), Alexander's reliance on Old Chief is misplaced.

In any event, any error here is harmless. Ample evidence supports the jury's determination that Alexander knowingly possessed the firearm found in the Tahoe. When Alexander was initially apprehended, he possessed the keys to the Tahoe and referred to the Tahoe as his truck. Indeed, Alexander had been observed driving the vehicle on many occasions. Moreover, law enforcement officers had intercepted phone calls in which Alexander acknowledged keeping a firearm in his vehicle on more than one occasion. Considering the nature of the evidence before the jury, we unhesitatingly conclude that the prior conviction played no role in the outcome of the trial on Alexander's § 922(g)(1) count. See United States v. Singleton, 441 F.3d 290, 295-96 (4th Cir. 2006) (affirming on harmless error basis constructive possession conviction, despite purported impermissible admission of hearsay).

VII

Melvin contends that there is insufficient evidence in the record to support his convictions on Counts Six, Seven, and Eight of the second superseding indictment. More specifically, Melvin contends that there is no evidence to show that he constructively possessed the weapons at issue.

When addressing sufficiency of the evidence challenges, we must affirm the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). Thus, "we shall reverse a verdict [only] if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt." Id.

The government's proof at trial on these counts related to the evidence recovered by law enforcement officers during the search of several locations. In the apartment which Melvin shared with Jones in Upper Marlboro, Maryland, law enforcement officers found a Glock .45 caliber pistol in Melvin's bedroom, the same room where Melvin was found and arrested. That gun, which was charged in Count Six (§ 924(c)(1) violation), was found in close proximity to drug ledgers, drug packaging material, ammunition, and more than $1,200 in drug proceeds. This evidence is more than sufficient to support Melvin's conviction on Count Six. See United States v. Mitchell, 104 F.3d 649, 652 (4th Cir. 1997) (holding that, in a § 924(c)(1) prosecution, the government must prove that the defendant used or carried a firearm, and the defendant did so during and in relation to a drug trafficking offense or crime of violence).

Law enforcement officers also searched the home of Dana Dark at 4310 Lavender Lane, Bowie, Maryland. On June 22, 2003, Antonio Mines, an associate of Melvin and Jones, had been stopped by law enforcement officers while driving a green Ford Explorer that had been transferred from Melvin to Jones to Mason to Mines. During that stop, law enforcement officers recovered a gun, a white powdery substance, and money in a hidden compartment. Thereafter, the officers intercepted a series of calls over the wiretaps in which Melvin and Jones discussed their concern about the possibility that law enforcement would obtain search warrants for their residence in the wake of Mines' arrest. As a result, Melvin and Jones discussed the need to store some of their guns at the Lavender Lane location. In coded language, Melvin directed Jones to have Audrey Melvin take the guns to Lavender Lane. In a subsequent call, Audrey Melvin reported to Melvin that she and Jones had gone that morning to "put those things up at Dana's house," a reference to Lavender Lane. At that location, the officers found a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol, as well as numerous magazines and rounds of ammunition. These four weapons were charged in Count Seven, which charged Melvin and Jones with violating § 924(c)(1), and aiding and abetting the same.

Melvin contends that there is insufficient evidence in the record to support the jury's conclusion that he constructively possessed the firearms found at the Lavender Lane location. He points out that the government did not present any evidence that he possessed the weapons that were ultimately recovered at the location.

Melvin's argument misses the mark. In Count Seven, he was charged with violating § 924(c)(1), and aiding and abetting the commission of a § 924(c)(1) violation. Under § 924(c)(1), anyone who uses or carries a firearm, during and in relation to a drug trafficking crime, is guilty of an offense against the United States. 18 U.S.C. § 924(c)(1). Further, a defendant is liable as an aider and abettor for use of a firearm during and in relation to a drug trafficking crime when his accomplice uses a firearm in relation to jointly undertaken criminal activity. See Rattigan v. United States, 151 F.3d 551, 557-58 (6th Cir. 1998) (defendant may be convicted of aiding and abetting a § 924(c) violation even if the defendant never had actual possession of a firearm during the course of committing the crime); United States v. Wilson, 135 F.3d 291, 305 (4th Cir. 1998) (discussing aider and abettor liability for § 924(c)(1) violations). In this case, there was more than enough evidence presented at trial for the jury to reasonably find that Melvin aided and abetted Jones' possession of the firearms found at the Lavender Lane location and that those firearms were

used during and in relation to the conspiracy to distribute cocaine.

At the residence of Audrey Melvin, Melvin's mother, in a room used by Melvin and which contained documents in Melvin's name and some of his other belongings, law enforcement officers found a rifle. This evidence is more than sufficient to sustain Melvin's Count Eight § 922(g)(1) conviction. See Moye, 454 F.3d at 395 (setting forth elements of § 922(g)(1) offense).[7]

## VIII

Jones, Mason, and Alexander argue that the district court erred when it refused to give a multiple conspiracy instruction to the jury on Count One of the second superseding indictment. A multiple conspiracy jury instruction is required only when "the proof at trial demonstrates that [the defendant was] involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." United States v. Squillacote, 221 F.3d 542, 574 (4th Cir. 2000) (citation and internal quotation marks omitted). A court commits reversible error by not giving such an instruction only when the defendant can establish that he was "prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial."

---

[7]Of note, the prior felony and interstate commerce elements are not in dispute.

- 42 -

<u>Id.</u> at 575 (citation and internal quotation marks omitted). To establish prejudice, the defendant must show that "there are so many defendants and so many separate conspiracies before the jury that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." <u>Id.</u> (citation and internal quotation marks omitted). Finally, to determine whether the evidence suggests a single conspiracy or multiple conspiracies, we consider factors such as "the nature of the activities, the location where the alleged events of the conspiracy occurred, the identity of the co-conspirators, and the time frame." <u>United States v. Burns</u>, 432 F.3d 856, 863 (8th Cir. 2005).

In this case, the government's evidence involved the same individuals, Jones, Mason, Alexander, Omar, Despiau, Elzey, and Wilder, working with each other to conduct the same activity, the distribution of cocaine and crack, in the same locations throughout the District of Maryland, and during the time frame alleged in the indictment. As a result, the evidence amply supports the jury's conclusion that Jones, Mason, and Alexander were part of the single conspiracy charged in the indictment. <u>United States v. Bowens</u>, 224 F.3d 302, 308 (4th Cir. 2000) (holding that it was not error for the district court to refuse to instruct the jury on multiple

conspiracies where evidence did not support the existence of multiple conspiracies).[8]


IX

A

Jones claims that the 300 month sentence imposed by the district court on Count One of the second superseding indictment violated the principles outlined in the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

Under Booker, a sentencing court is no longer bound by the sentencing range prescribed by the Sentencing Guidelines. United States v. Moreland, 437 F.3d 424, 431-32 (4th Cir.), cert. denied, 126 S. Ct. 2054 (2006). However, in imposing a sentence post-Booker, the court still must calculate the applicable sentencing range under the Guidelines after making the appropriate findings of fact and consider the range in conjunction with other relevant factors under the Guidelines and § 3553(a). Id. at 432. This court will affirm a post-Booker sentence if it "is within the statutorily prescribed range and is reasonable." Id. at 433 (citation and internal quotation marks omitted).

---

[8]Because a multiple conspiracy instruction was not required, it follows that Jones, Mason, and Alexander were not entitled to a severance based on their allegation that the government's evidence involved multiple conspiracies.

In this case, the jury found that Jones was part of a conspiracy to distribute in excess of five kilograms of cocaine and fifty grams of crack.  Accordingly, the statutory maximum for Count One was life imprisonment.  21 U.S.C. § 841(b)(1)(A).  In sentencing Jones, the district court determined that Jones was responsible for in excess of 150 kilograms of cocaine, which placed him at a base offense level of 38, United States Sentencing Commission, Guidelines Manual, § 2D1.2(c)(1).  The court added three levels to Jones' base offense level for his role as a manager or supervisor in the drug conspiracy, id. § 3B1.1(b).  Coupled with Jones' criminal history category of III, his total offense level of 41 produced a sentencing range of 360 months to life imprisonment.  After considering the § 3553(a) factors, the court sentenced Jones to 300 months' imprisonment on Count One.

Jones argues that his sentence was higher than the sentence allowed under the jury-found facts.  According to Jones, the jury-found facts (in excess of five kilograms of cocaine and in excess of fifty grams of crack) would have placed him at a base offense level of 32, instead of the base offense level of 38 found by the district court.

Jones' argument misconstrues Booker's constitutional analysis, which focuses on the actual sentence imposed, not on the offense level used in computing the sentence under the Guidelines.  See United States v. Hughes, 401 F.3d 540, 547 (4th Cir. 2005) ("In

Booker, the Court ruled that a sentence exceeding the maximum allowed based only on the facts found by the jury violates the Sixth Amendment."). Here, on the facts found by the jury, Jones was eligible for a sentence of life imprisonment on Count One. The actual sentence imposed was 300 months' imprisonment. Jones' sentence, in other words, fell short of the maximum sentence that the court could have imposed based solely upon the jury's determinations. Thus, there was no constitutional Booker error.

B

Jones also claims that, because the government failed to refile an information regarding a prior conviction before trial on the second superseding indictment, the government violated the dictates of 21 U.S.C. § 851.[9]

Prior to Jones' first trial on the drug conspiracy charge, the government filed a § 851 notice, specifically referring to Jones'

---

[9]Section 851 provides that, where the government seeks to establish prior convictions for the purpose of increasing the applicable criminal penalties for a drug offense under § 841, the proper procedure is as follows:

No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

21 U.S.C. § 851(a)(1).

prior conviction for a felony drug offense.  The changes to Count One of the second superseding indictment were immaterial.

Jones claims that the government was required to refile the § 851 notice before it could seek the twenty-year mandatory minimum sentence outlined in § 841(b)(1)(A).  This argument is without merit.

Under existing case law, the government was not required to refile its notice after the return of the second superseding indictment.  See, e.g., United States v. Cooper, 461 F.3d 850, 854 (7th Cir. 2006) (holding that, "where the Government files a timely Section 851 notice, it is not required to file a second notice after an intervening event, such as a trial or a superseding indictment, in the same case"); United States v. Mayfield, 418 F.3d 1017, 1020 (9th Cir. 2005) (holding that "filing the information and giving the section 851(a) notice before [the defendant's] first trial obviated any need to refile the information and regive that notice before his second trial"); United States v. Kamerud, 326 F.3d 1008, 1014 (8th Cir. 2003) (holding that "the government is not required to refile a notice of enhanced sentence under 21 U.S.C. § 851 after the return of a superseding indictment"); United States v. Williams, 59 F.3d 1180, 1185 (11th Cir. 1995) (holding that, once filed, an information need not be refiled for each consecutive trial in the same court).  In this case, the crime charged in Count One of the second superseding indictment was not

fundamentally different from the crime charged in Count One of the superseding indictment, and both indictments were charged in the same court. Jones was given ample notice that he was subject to an enhanced sentence if the jury convicted him of a conspiracy to distribute in excess of five kilograms of cocaine and fifty grams of crack. Accordingly, we hold that the government's failure to refile the § 851 notice prior to Jones' second trial did not result in the imposition of an erroneous sentence.

X

For the reasons stated herein, the judgments of the district court are affirmed.

AFFIRMED